THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MICHAEL D. LINTZ, Defendant-Appellant.

Second District   No. 2—91—0960

Opinion filed June 7, 1993.

G. Joseph Weller and Kim M. DeWitt, both of State Appellate Defender's Office, of Elgin, for appellant.

Michael J. Waller, State's Attorney, of Waukegan, and Brian L. Buzard, of Mt. Morris (William L. Browers, of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE COLWELL delivered the opinion of the court:

Defendant, Michael Lintz, pleaded guilty to aggravated criminal sexual abuse (Ill. Rev. Stat. 1989, ch. 38, par. 12—16(d) (now 720 ILCS 5/12—16(d) (West 1992))) and was sentenced to six years' imprisonment. Defendant appeals his sentence, contending that the court abused its discretion in sentencing him to one year less than the maximum term when he had no criminal record and there were other mitigating factors. We affirm.

Defendant was indicted on one count of aggravated criminal sexual abuse and three counts of criminal sexual assault based on defendant's conduct with C.G., who was at least 13 but under 18 years old when the conduct occurred and defendant was more than five years older than C.G. (See Ill. Rev. Stat. 1989, ch. 38, par. 12—13(a)(4) (now 720 ILCS 5/12—13(a)(4) (West 1992)).) The latter three charges were nol-prossed when defendant pleaded guilty to the sexual abuse charge. The trial court found as a factual basis that defendant placed his hand on the breasts and vagina of C.G., who was 16 years old at the time.

At the sentencing hearing, Investigator Mark Pleasant testified that he interviewed defendant on January 7, 1991, regarding his relationship with C.G. Defendant explained that he met C.G. when she was 14 or 15 years old and a student in the high school district where defendant was a substitute teacher and a bus driver. Defendant also was acquainted with the victim through a summer day camp where she had been employed and defendant was the assistant camp director. Defendant admitted to sexual contact with the victim going back to 1987, which progressed from kissing and hugging to fondling virtually every day during the summer of 1990 in the day camp bus. Defendant also admitted that he had sexual intercourse with the victim on August 13, 1990, and that he wore a condom to her house that day in the event they would engage in intercourse. Defendant was aware that C.G. was a special education student. Defendant informed Pleasant that the victim had sent defendant cards and letters and the relationship was mutual.

Pleasant further testified that defendant admitted that he had sexual contact with another teenage girl in 1972. Cathy was a 16-year-old high school student, and defendant was a teacher in a junior high school.

According to Pleasant, he interviewed defendant again on January 8, 1991. During this interview, Pleasant typed defendant's statement, which defendant then signed. In the statement, defendant stated that he graduated from college in 1971 and became employed at a junior high school in Glendale Heights. Near the end of that

school year, he "had [his] first problem, or affair, with a young female student," Cathy. Defendant met her after a band performance. Cathy attended a different school from the one where defendant was employed. About two months after he met Cathy, defendant began kissing her. Defendant kissed her on another occasion. A few weeks later, in Cathy's house, they were kissing and he became sexually aroused. Defendant rubbed her breasts and vagina, and Cathy rubbed his penis. "Something clicked inside [defendant's] head at that point and [he] stopped what was happening because [he] knew it was wrong." After that, defendant did not have any sexual contact with other young girls until he got involved with Lori Hahn (birthdate October 1969) and C.G. (birthdate December 1972).

In addition to the facts related to Investigator Pleasant on January 7, defendant stated that at the beginning of his relationship with C.G., in September 1987, she seemed to trust defendant and confided in him about her personal problems. She gave him hugs, but "it all seemed innocent." Toward the end of the 1987-88 school year, "the hugs turned into small kisses," and defendant became sexually aroused. The kissing occurred in defendant's car while they were at a park. "Things sexually began to happen during the first week of camp." C.G. had been hired as a camp counselor, and defendant was the assistant camp director and the camp bus driver. The incidents occurred in the morning on the bus, before defendant picked up the rest of the counselors. Defendant would park the bus, and he and C.G. "would kiss and pet each other." Sometimes defendant put his finger in C.G.'s vagina, and she would masturbate him. Defendant related one incident in which C.G. performed oral sex on defendant. Defendant stated that he never performed oral sex on C.G., but she performed oral sex on him three times. Defendant explained:

"I believe that I got involved sexually with [C.G.] because things at home, sexually, were nonexistent. I was vulnerable. I believe I was starting to fall in love with her and I have always been a sucker for someone with a problem. [C.G.] had problems at home and was always looking for ways to get attention or some sympathy. I think I fell into that trap with her. I never told [C.G.] not to tell anyone about our relationship but I worried about it coming out. *** I never threatened [C.G.] or forced her to do anything in any way. She semmed [sic] to want the sex as much as I did. Nevertheless, I knew that my sexual relationship with [C.G.] was wrong and illegal. It was just a time where I was out of control and I could not stop it."

Defendant also discussed his relationship with Hahn. Defendant met her in 1987 when she was a senior in high school and she rode defendant's bus. They started having physical contact late in May 1989. The contact started with kissing and progressed into a sexual relationship. They had sexual intercourse several times during the summer and fall of 1989, usually in defendant's car. On two occasions, in September and November 1990, they went to a motel. Hahn had been a special education student, and she had epilepsy which caused some brain damage.

At the end of the statement, defendant stated:

> "I feel better now that I have talked about this situation. I have not told my wife the whole truth and I did not tell her anything until last night. I have not confided in anyone else about this but I have thought about talking to a social worker \*\*\*. \*\*\* In summary, I feel disappointed in myself, remorseful, I regret the incidents, and I want to take every possible step to insure that another incident like this never happens again. I feel surprised that [C.G.] told because she seemed to enjoy our relationship."

Pleasant testified that later on January 8 defendant contacted the Lake County Children's Advocacy Center and gave an additional statement relating another incident with C.G. which defendant had forgotten to mention. The following morning, defendant called Pleasant. Pleasant asked defendant if he had ever been arrested. Defendant informed Pleasant that defendant had been arrested at Children's Memorial Hospital for masturbating in the cafeteria. Pleasant then requested that defendant come to the police department to continue the discussion.

Defendant went to the police department and admitted that he had not been entirely truthful with the police. Defendant then admitted that he had sexual contact with six teenage girls, both at the camp and at various locations in Lake County. Defendant also related an incident in 1980 at a store where he had gotten aroused by the sight of a woman's foot and had begun to masturbate. He stopped after he was confronted by another female shopper. A similar incident occurred in 1986 at Northbrook Court Mall. Defendant was in the dining area and became aroused after looking at a woman's foot. Defendant masturbated, and a security guard asked him to leave. Defendant discussed in greater detail the incident at the hospital. According to defendant, in 1983 he was in the cafeteria at the hospital when he became aroused by looking at a woman's foot. Two security guards ar-

rested him after he began masturbating. Defendant went to court, but no one showed up to testify against him, and "nothing came of it."

Defendant also admitted that he had been attracted to several 15- or 16-year-old girls: one in 1979 who "came on to him," one in 1983, whom 'he fondled, and one in 1989, whom he hugged and kissed. In 1990, defendant "rubbed the buttocks" of a 15-year-old he met at the camp.

Defendant was attracted to females age eight and up, in addition to having a foot fetish. Defendant admitted to Pleasant that in the cafeteria at the high school there were occasions when he "looked at the feet of female staff and students, had become aroused, and had masturbated." On at least one occasion, defendant peeked into the girl's shower at the camp and became aroused. In the course of his duties as pool director, he gave swimming lessons to young girls and became aroused by their feet.

According to the presentence report, defendant was 42 years old and had a bachelor of arts degree in secondary education. Defendant first was employed as a band director at a junior high school in 1971. Defendant worked at the day camp during the summers from 1969 to 1990. From 1980 through 1990, defendant was a school bus driver and a teacher's aide for a high school district. He was terminated from these positions. Defendant's criminal record consisted of two traffic violations. Defendant was first married in 1972 and divorced in 1981. Defendant had a son from his first marriage, who was 15 years old at the time of the sentencing. Defendant remarried in June 1985, and the second marriage broke up as a result of the offense at issue. During the marriage, his second wife was unaware of defendant's deviant sexual behavior. According to the presentence report, defendant's girlfriend was Lori Hahn, age 20. Hahn stated that defendant was " 'a great guy who wouldn't do anything to anyone to hurt them.' " Hahn also stated that she and defendant were planning to get married. Hahn had been a special education student. Hahn's father contacted the probation officer and indicated that he was very concerned about his daughter seeing defendant. Mr. Hahn provided the probation officer with documents which stated that Hahn was mentally disabled and had an IQ of 71. Mr. Hahn reported that defendant continually called and visited with Hahn.

In the victim impact section of the report, C.G. stated that defendant was like a father figure to her and she trusted him. Defendant took advantage of her when she was vulnerable and broke her trust. C.G. experienced nightmares as a result of her relationship

with defendant, and her relationship with her mother became strained. C.G. described the incident as "very disturbing."

The presentence report further stated that defendant had been in the Army Reserves and was discharged honorably in 1977. The report recommended that defendant be committed to the Department of Corrections to protect the community and deter others from committing similar crimes. In the event that the court decided against incarceration, the presentence report recommended a term of periodic imprisonment and that defendant have no unsupervised contact with children, not be involved in any occupation involving the care of children or working with developmentally or intellectually disabled adults, and that defendant attend additional counseling.

Also in the record is a copy of a clinical assessment by Jeffery Martin of the Community Youth Network. Martin noted that defendant admitted to having a variety of sexual contacts with seven children, ranging in age from 15 to 18, over a 20-year period. Defendant initiated contact with the children "in an authoritative capacity as a teacher, bus driver or assistant camp director." Defendant began by getting the child into an isolated situation where he made general sexual advances. If the child was receptive, he pursued and escalated the involvement. Defendant had sexual intercourse with two of the girls, both special education students. However, one of them was 20 when they first had intercourse. Martin concluded that it was "highly probable" that a pattern of deviant sexual behavior existed which spanned a 20-year period. In addition, Martin noted that although defendant said he was responsible for the sexual relationships, defendant ascribed "a good deal of [the] blame onto his victims." Defendant stated that he did not force, manipulate, or coerce any of the children to participate in sexual activities with him. "He viewed all children as willing participants in the sexual behavior."

In addition to the three masturbation incidents, defendant also was confronted in 1987, when he hugged a student on his bus. Defendant's reaction to these confrontations was feeling uncomfortable with the situation and not wanting anyone to think anything was going on.

Defendant was not direct in discussing his sexually deviant behavior, but revealed the information in bits during the course of the three interviews. Defendant expressed an interest in understanding his motivation for being sexually involved with children and in modifying and changing himself to stop his sexual acting out. However, Martin stated that defendant's motivation for wishing to discontinue the sexual acting out appeared to be defendant's legal difficulties.

Martin considered defendant an appropriate candidate for sex offenders specific treatment based on defendant's willingness to accept responsibility for his behavior; his admitting guilt; his interest in and understanding of his problems; his insight into his deviant sexual behavior and his motivation to make changes; his sensitivity to his victims and understanding of the impact of his actions on his victims; and because the psychological testing did not suggest the presence of a mental illness or psychosis. However, Martin had concerns regarding defendant's treatment affecting the safety of the community. Specifically, Martin noted that defendant had an extended and lengthy history of deviant arousal patterns and acting out. In addition, "[i]n spite of being confronted on [sic] his sexual acting out on at least four occasions, he has persisted in responding to sexually deviant arousal patterns." Defendant's attitude suggested a "strong emotional congruence to being sexually involved with minor children." Defendant showed little regard for the age of the children or that they were involved in special education. Finally, Martin noted that defendant showed "a heightened level of immaturity," which indicated that defendant was likely to continue to be more comfortable with children than with adults.

A psychological evaluation, conducted by a clinical psychologist, concluded that defendant's behavior followed a cyclical pattern characterized by periods of acting out followed by periods of guilt and remorse in which defendant appears contrite and well controlled. The report stated that defendant appeared to be in the latter phase and the guilt and remorse defendant was expressing would not effect any change in his behavior.

The intensive probation supervisor for Lake County sent a letter to the court stating that defendant could not participate in that program because he could not reside in Lake County. The deputy chief probation officer for the intensive probation program in Cook County, where defendant resided, rejected him because "Defendant would present a danger to the Community."

In mitigation, Sandy Gordon Stiebel testified that she knew defendant for over 20 years through their employment at the day camp. Stiebel stated that defendant was one of the finest people she knew and was reliable. Stiebel did not believe that defendant was a risk to society, and she had never seen him exhibit any violent tendencies. Stiebel was convinced that defendant would never molest children again.

Defendant's father testified that defendant's mother died shortly before the sentencing hearing and defendant's father relied on

defendant. In addition, defendant's father stated that defendant had never been violent and he was always truthful. Defendant's father believed that defendant would abide by any terms of probation the court imposed on him.

Defendant testified that he went to the Community Youth Network after his arrest on January 10, 1991. Defendant sought counseling, and he was accepted into the program there. Defendant believed that he would benefit from the program. He stated that he would be able to abide by any requirements of probation and that he would stay away from children. Defendant was supporting his son by working at a messenger service. Defendant stated that as a result of his arrest he and his second wife were divorced in February 1991.

Defendant submitted letters written in his behalf. These letters from friends emphasized defendant's volunteer work for muscular dystrophy and other charities. They also described defendant as warm, caring and compassionate. Defendant also submitted letters and cards he received from C.G.

In allocution, defendant admitted responsibility for his conduct with C.G., and he regretted what he had done. Defendant noted that he lost his job with the school district, his license to drive a school bus, his ability to work at the day camp, his marriage and his mother. Defendant stated that he learned "a very cold, hard lesson," and he accepted the reality of his situation. Defendant reiterated his intention to cooperate with any probation program and that he would never commit another offense.

The State argued for the maximum term of imprisonment to protect the public. Defense counsel responded that incarceration would not protect the public because it would not help defendant overcome his problem. Defense counsel stressed that defendant needed counseling and treatment, which would be available if defendant were sentenced to probation.

In response to defense counsel's argument that no weapon or threat of force was used in the offense, the trial court stated:

> "[T]here is some argument relative to the use of a weapon, and perhaps whether or not this is a crime of violence. I take it there shouldn't really be any question of that any more that someone in his position of authority, school teacher and educator, using that position as a teacher, educator, for his own sexual gratification, in particular with special education students, God, if that is not an act of violence, I really don't know what is."

The court also noted that defendant's acts had a negative effect on the girls' social development, and it emphasized that some of them were in special education programs. The court found that defendant's rehabilitative potential was slight because, when defendant was confronted four times, he continued to act out sexually. On the factor of defendant's remorse, the court remarked that defendant showed little consideration for the ages of the children or the fact that two of them were special education students. The only factor in mitigation was defendant's lack of a criminal record. The court concluded that the protection of the public was the most important factor.

Defendant filed a motion to reconsider the sentence. The court denied the motion, and defendant timely appealed.

■ Defendant first argues that the court erred in considering whether a weapon was used in the offense and whether the offense was violent. However, the court did not state that it believed that a weapon was used in the offense. The court was incorrect in finding that the crime was one of violence. The State responds that any error in this regard is harmless. The main reason the court determined that defendant should be incarcerated was the court's concern for the safety of the public. We therefore agree with the State that we need not remand the cause for resentencing. See *People v. Bourke* (1983), 96 Ill. 2d 327, 332.

■ Defendant next argues that the court erred in finding that defendant's conduct destroyed the girls' chances at normal development. Although no evidence was introduced to show what harm defendant inflicted on any of the girls other than C.G., "any sexual abuse, regardless of its extent, causes harm to the victims" (*People v. Dugan* (1992), 237 Ill. App. 3d 688, 701). Defendant further argues that the court should not have relied on the fact that C.G. and Hahn were special education students. However, the remark was made in passing and was not the primary focus of the trial court's analysis. Moreover, in the context of whether defendant was remorseful, that defendant selected special education students was relevant because these girls already had problems, and defendant exploited their problems to get close to them. Thus, the court did not err in considering that C.G. and Hahn had been special education students.

■ Finally, defendant argues that the six-year sentence was excessive. Defendant asserts that he should have been sentenced to probation and treatment. The psychological reports and the presentence report recommended strict limitations on probation if the court chose that option. However, intensive probation was not an option because the Cook County probation department concluded that defendant was

not appropriate for intensive probation and defendant was unable to reside in Lake County. Thus, the court could not sentence defendant to a term of probation.

Defendant further asserts that even if the court could sentence him to a term of incarceration, the court abused its discretion by sentencing him to a term one year short of the maximum. The determination of a sentence is a matter of the trial court's discretion, and we will not vacate or modify a sentence unless the trial court abused its discretion. (*People v. Gonzalez* (1992), 151 Ill. 2d 79, 89.) When the sentence imposed is within the statutory limits, the reviewing court will not modify it unless "the sentence imposed is a clear departure from the spirit and purpose of the fundamental law and the constitutional requirement that the sentence be proportionate to the nature of the offense and that the possibilities for rehabilitation be taken into account." (*People v. Luna* (1992), 234 Ill. App. 3d 544, 550.) The sentence here falls within the statutory range of three to seven years. See Ill. Rev. Stat. 1991, ch. 38, pars. 12—16(d) (now 720 ILCS 5/12—16(d) (West 1992)), 1005—8—1(a)(5) (now codified, as amended, at 730 ILCS 5/5—8—1(a)(5) (West 1992)).

We reject defendant's argument that the sentence should be vacated because the court did not consider as factors in mitigation that he served honorably in the military reserves, he participated in volunteer work for charity, and he supported his son financially. The trial court is not obligated to recite each factor it considered. (*People v. Caraballo* (1992), 231 Ill. App. 3d 685, 689.) Where the defendant presented mitigating evidence in the sentencing hearing, the reviewing court will presume that the sentencing court considered it, absent some indication to the contrary. *People v. Chandler* (1992), 231 Ill. App. 3d 110, 116.

Although the trial court discussed various factors in aggravation, the primary factor for the six-year sentence was the protection of the public. The trial court properly considered defendant's lengthy history of sexually abusing teenage girls by using a position of authority to gain their trust. (See *People v. Williams* (1992), 149 Ill. 2d 467, 490-91.) A trial court need not place greater weight on a defendant's rehabilitative potential than on the seriousness of the offense and the need to protect the public. (*People v. McDonald* (1992), 227 Ill. App. 3d 92, 100.) Although defendant may have been remorseful, one of the psychological assessments indicated that this remorse was part of a cycle in which defendant would return to his deviant behavior, and his remorse would have no effect. The reports also stated that defendant was attracted to girls as young as eight years old, and he consid-

ered any child as a willing participant in sexual activities. The trial court concluded that the only significant factor in mitigation was defendant's lack of a criminal record. The six-year sentence reflects the court's determination of the balance of the factors.

Although we might have weighed the sentencing factors differently and imposed a different sentence, we must defer to the trial court's decision because it had the opportunity to consider, firsthand, defendant's credibility, demeanor, and general moral character. (*People v. Streit* (1991), 142 Ill. 2d 13, 19.) We decline defendant's invitation to compare his sentence with the sentences imposed in other cases because the proper penalty must be based on the particular circumstances of the individual case, including the nature of the offense and the character of the defendant. (*People v. Saldivar* (1986), 113 Ill. 2d 256, 268-69.) Based on all the evidence presented at the sentencing hearing, we conclude that the trial court did not abuse its discretion in sentencing defendant to six years' imprisonment.

The judgment of the circuit court is affirmed.

Affirmed.

INGLIS, P.J., and DOYLE, J., concur.