(No. 96367.

THE PEOPLE OF THE STATE OF ILLINOIS, Appellant, v. GERALD SCOTT HUDDLESTON, Appellee.

*Opinion filed June 4, 2004.—Rehearing denied October 4, 2004.*

Lisa Madigan, Attorney General, of Springfield, and Thomas J. Brown, State's Attorney, of Pontiac (Gary Feinerman, Solicitor General, and Linda D. Woloshin and Domenica A. Osterberger, Assistant Attorneys General, of Chicago, of counsel), for the People.

Daniel D. Yuhas, Deputy Defender, and Nancy L. Vincent, Assistant Appellate Defender, of the Office of the State Appellate Defender, of Springfield, for appellee.

JUSTICE RARICK delivered the opinion of the court:

Defendant, Gerald Huddleston, was charged by information in the circuit court of Livingston County with three counts of predatory criminal sexual assault pursuant to section 12—14.1(a) of the Criminal Code of 1961 (Code) (720 ILCS 5/12—14.1(a)(1) (West 2002)). Each count pertained to a separate victim. Prior to trial, defendant filed a motion seeking to have section 12—14.1(b)(1.2) of the Code declared unconstitutional, arguing that it violates state principles of proportionality and due process. Section 12—14.1(b)(1.2) mandates a sentence of natural life imprisonment when a person is "convicted of predatory criminal sexual assault of a child committed against 2 or more persons regardless of whether the offenses occurred as the result of the same act or of several related or unrelated acts." 720 ILCS 5/12—14.1(b)(1.2) (West 2002). The circuit court deferred ruling on the motion until after it had heard evidence in the case.

After the court found defendant guilty on all three counts, the court entertained arguments on defendant's motion and ultimately ruled that the statute is not unconstitutional "on its face." The court left open the question of whether the statute might be unconstitutional as applied to defendant until the court considered the evidence adduced at sentencing. Following the presentation of that evidence, the circuit court ruled that the statute was unconstitutional as applied to defendant in that it violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The court sentenced defendant to consecutive 10-year sentences of imprisonment. The State appealed directly to this court. See 134 Ill. 2d R. 603. The sole issue we are

asked to consider is whether the circuit court erred in holding section 12—14.1(b)(1.2) of the Code unconstitutional as applied to defendant. We hold that it did.

## BACKGROUND

The information in this case, filed on May 9, 2002, alleged that defendant had committed an act of predatory criminal sexual assault of a child, on or about March or April of 2002, in that he had placed his penis in the mouth of C.D., a child "nearly" 10 years old. The other two counts charged that defendant had committed similar acts with 10-year-old K.F. and D.R. on or about May 7, 2002.

On September 12, 2002, defendant filed a motion to suppress a statement he had made to the police and a motion challenging the constitutionality of the sentencing provisions of section 12—14.1(b)(1.2) of the Code on grounds that it violates constitutional principles of proportionality and due process. On October 31, 2002, the circuit court heard testimony and argument on defendant's motion to suppress. The evidence presented indicated that defendant initially denied having engaged in any sexual activity with the children and he continued to do so for "a period of time." However, he eventually acknowledged that he had engaged in acts of sexual penetration with the children, and he gave a statement to that effect. The court ultimately denied defendant's motion to suppress, ruling that defendant's statement was "both voluntarily and knowingly given." The court deferred ruling on defendant's other motion until it had heard the evidence in the case.

The matter was tried before the court on November 12 and 13, 2002. Detective Earl Dutko of the Livingston County sheriff's department testified that he and Detective John Johnson met with defendant on May 8, 2002, at defendant's home in Fairbury. They arranged for the defendant to meet with them at the Fairbury police

department. At the police department, defendant was informed of his rights and apprised of the allegations against him. Defendant initially denied any involvement. At some point in the questioning, defendant was asked about a criminal "conviction" in McLean County in 1996. The presentence report indicates that defendant had pled guilty to public indecency in 1996. After a time, defendant acknowledged improprieties with the children and he agreed to provide a written statement of his activities. He declined to participate in an audio/video statement. Detective Dutko identified defendant's written statement, which was subsequently admitted into evidence. The statement, with appropriate modification to protect the privacy of the juvenile victims, reads, verbatim, as follows:

"I Scott Huddleston do hereby attest that while in the course of my teaching duties I had inappropriate sexual contact with three of my students. After school I played a food taste game with them and placed my penis in their mouth [*sic*]. I placed my penis in [C.D.]'s mouth for a period of about 15 seconds. In [K.F.]'s for about 5 seconds. And in [D.R.]'s for 30 seconds. I used food for them to lick off. Food which I had left-over in my day's lunch. I stopped at the end of [D.R.]'s time because I became aroused and realized how wrong it was. I never would have physically hurt them. Never!! It was a stupid thing to do and I know that. All of the incidents occurred after the school day was over.

I used pudding on May 7th with [D.R.] and [K.F.]. I cannot recall the food that I used with [C.D.]. I wish that I could tell them how *sorry* I am for betraying their trust. I need help with this problem. Please let them know that I was wrong and that adults can still be trusted.

I had only intended to have them help me in cleaning chores in the room. Something snapped inside me and I went too far. I wish I could fix my transgressions. I don't know why I did what I did. I need help concerning this. My wife and son mean everything to me. I am sorry for disappointing them. I ask for everyones [*sic*] forgiveness.

I *never* fantasized about doing this. It was a stupid thing that happened that I truly regret." (Emphases in original.)

Detective Johnson testified, corroborating what Detective Dutko said in his testimony. Johnson stated that defendant "eventually \*\*\* confided \*\*\* that he had in fact had sexual acts with the children." Johnson also noted that the officers had questioned defendant about a 1996 incident in his criminal history. The officers asked defendant what had occurred during that incident, and whether the conduct might have involved young victims.

C.D. testified that she was born on June 19, 1992, and, in the spring of 2002, she was in the fourth grade at Chatsworth Elementary in Livingston County. At that time, defendant was her art teacher. Sometime in March of 2002, defendant asked her to come to the art room. She was alone with defendant in the art room for about 15 minutes after school, and he suggested that they play a food taste-test game. Defendant seated her in a "really tiny" chair, along the same wall as the only door to the room, but at the other end of the room from the door.

After he blindfolded her, defendant gave her foods and she tried to guess what they were. Defendant first placed pickles in her mouth; she recognized the taste. He then gave her chocolate pudding. She testified that she could taste the chocolate, but she could not identify the type of food or the object it was on. Defendant did not place a spoon in her mouth; it was, rather, a cylindrical object. After she guessed incorrectly, defendant told her it was pudding, he took off the blindfold, and she left the room.

Sometime later, she spoke to the other two victims and they came to the consensus that "something weird" was going on. Subsequently, they mentioned the incidents to the lunchroom teachers.

K.F. testified that she was born on October 7, 1991, and, in the spring of 2002, she was in the fourth grade at Chatsworth Elementary in Livingston County. At that

time, defendant was her art teacher. Pursuant to defendant's designation, she was the helper in defendant's art class on May 7, 2002. She stayed after school to help clean up. Defendant told her if she did a good job she would get to play a taste-test game. After she had finished cleaning up, defendant placed her in a small chair back in the corner of the room, where she could not be seen from the door. He blindfolded her and the "game" began.

Defendant first gave her marshmallows and then pretzels to taste. She guessed correctly and was given Starburst candy as a reward. Defendant then put either pudding or peanut butter in her mouth. The object he used was not a spoon or a wooden stick or tongue depressor. Defendant was so close to her at the time that she could feel her breath back in her face. She felt "kind of weird." Defendant told her to open her mouth wider, so he could get the object into her mouth. K.F. said the substance she was given did not taste at all like pudding or peanut butter. She described it as "sour and salty and nasty."

When K.F. told defendant she was going to take off her blindfold, defendant said, "No, wait," and ran behind her. She heard defendant get a paper towel out of the towel dispenser and wipe something off. She also heard a sound like pants going together. It took defendant a while, but he finally told her she could take the blindfold off, get her Starburst, and go. K.F. talked about the incident with her friends afterward.

D.R. testified that she was born on April 17, 1992, and, in the spring of 2002, she was in the fourth grade at Chatsworth Elementary in Livingston County. At that time, defendant was her art teacher. On May 7, 2002, she was in the boys and girls club after school and decided to go to the art room to finish a project. Defendant was there and asked if she wanted to play a game. He took

her to the back of the room, along the same wall as the door, and told her to sit down in a small chair. He then placed food in her mouth: first a marshmallow, then a graham cracker, then pudding. The pudding was not on a spoon or a wooden object such as a tongue depressor. It was on something long, straight and circular. The end of the object was round. It was bigger than a marker. D.R. swallowed the pudding from the object and it was then removed from her mouth. At that time, there was a knock at the door. Defendant said she could take off the blindfold and leave.

D.R. later told her teacher about the incident. In fact, D.R. said she thought something was not right when she went home that night. She thought the pudding did not taste right, and the object used to introduce it into her mouth was a part of a person, and should not have been in her mouth.

After D.R.'s testimony, the State rested. The defense rested without presenting evidence. The court found defendant guilty on all three counts. On January 2, 2003, prior to the commencement of defendant's sentencing hearing, the circuit court ruled that section 12—14.1(b)(1.2) of the Code is "on its face valid." The court left open the question of "whether that statute is a constitutional exercise of authority by the legislature as it is applied to this defendant and the facts of this case." The court reserved ruling on that issue until it heard the evidence at sentencing.

Just prior to the taking of testimony at defendant's sentencing hearing, the court acknowledged that it had received and examined the presentence report. The report was compiled from reports of the Livingston County sheriff's department, the Illinois Department of Children and Family Services, and other sources available to the reporting probation officer. Given the magnitude of the issue before us, we will examine the

report, and all other evidence pertinent to sentencing, in depth.

The report cites various oral statements defendant made that elaborate on the details of the crimes. For example, defendant admitted that he had put chocolate pudding on the end of his penis and K.F. had licked it off. Afterward, he turned around, wiped off the pudding with a paper towel, and then pulled up his pants. Later the same day, he again put pudding on the end of his penis and put his penis in D.R.'s mouth for about "thirty to sixty seconds." Defendant stated, "I think I got an erection towards the end." He admitted he told her: "open your mouth big" and "use your tongue." Defendant acknowledged he had previously placed his penis in C.D.'s mouth for "about fifteen or thirty seconds." Examination of garbage taken from defendant's classroom shortly after the incident revealed therein two paper towels with a brown substance on them that appeared to be chocolate pudding.

Defendant expressed sorrow for what he had done. As noted previously, when he gave his *written* statement, defendant voiced concern for the welfare of the children.

School secretary Stephanie Nagey was interviewed and told of an incident approximately one month before when she had gone to defendant's classroom to deliver a message to him at the end of the school day. Nagey found the door to the classroom locked. Defendant came to the door and stood in the doorway, seeming to block her entrance. Nagey noticed one of the victims (C.D.) in the room and Nagey wondered why she was still there at that time of day. Nagey noticed that defendant seemed "hurried," and she felt she had intruded on something and was not welcome there.

The presentence report indicates that defendant sent his wife and pastor to the school on May 29, 2002, to remove some of his personal items, and they were al-

lowed to do so. However, defendant's pastor was not allowed to open defendant's locked filing cabinet. Subsequently, with the school principal's permission, defendant's filing cabinet was forcibly opened to further the investigation of this matter. Inside the cabinet, officers found female underwear, Playboy magazines, pornographic pictures, pornographic playing cards, a pornographic catalog, a video tape containing, in part, a pornographic movie, and 48 computer discs, 28 of which contained pornography. All the subjects depicted in the pornography were adults.

On a written information sheet, completed as part of the presentence investigatory process, defendant stated:

"Your honor, I feel that a life sentence is too extreme. I would like the chance to prove to you and society that I can be rehabilitated. I have already lost my house, car, and my job. My wife and son mean the world to me. Please give me a chance to prove myself."

The portion of the presentence report dedicated to criminal history contains only one notation relevant to the issue before us. On October 5, 1996, defendant pled guilty to the offense of public indecency and received a sentence of 12 months' court supervision. The victim's statement in that case indicated that defendant, on three separate occasions, stood in the doorway of his apartment, which faced hers, and while nude "flopped his penis back and forth."

Defendant indicated that his wife and parents had been supportive through the prosecution of this case. He described his relationship with his parents as "good" and his relationship with his wife as "perfect, wonderful, amazing." Defendant told the reporting officer that he had an eight-year-old son by Trisha Webb, a previous paramour. Defendant stated he was paying child support as ordered until he was incarcerated on these charges. He denied ownership of any significant assets.

Defendant denied any past mental health treatment

or any current mental health problems. He further denied any problems with alcohol or drugs.

The reporting probation officer noted, in conclusion, that defendant seemed remorseful in his statements to police. The officer observed, however, that, with regard to defendant's written comments to the court on the presentence information sheet, "no concern about the victims is noted."

The first witness to testify at defendant's sentencing hearing was Dr. Robert Chapman, a psychiatrist called by the defense. Chapman evaluated defendant at defense counsel's request. He spent two hours with defendant. Chapman testified that defendant suffers from adult attention deficit disorder (ADD)—characterized by "impaired attention concentration, impulse control and judgment"—and an unspecified personality disorder with obsessive-compulsive and dependent features. Chapman believed the clinical evidence was insufficient to make a diagnosis of paraphilia and/or its subcategory, pedophilia. Chapman indicated that a diagnosis of paraphilia would apply to an individual "who suffers over a period of at least six months intense recurring sexually deviant arousal or behavior" that "impairs the person's function in most areas of their life."

Chapman testified that ADD was more likely relevant to the commission of these offenses than the personality disorder because a person with ADD suffers "some degree of impairment of impulsivity and judgment and difficulty controlling inhibitions." Chapman noted that ADD is manageable and treatable. Chapman stated his opinion that defendant presented a minimal risk of reoffending so long as he was not in a "position of authority, power or trust with prepubescent females."

Under cross-examination, Chapman admitted there might be "a lot" of positions of "authority, power or trust" from which defendant would have to be restricted

in order for a minimal risk assessment to apply. The prosecutor asked Chapman if he had taken account of certain behavior that exhibited planning and orchestration in the commission of these offenses. When Chapman said he had, the prosecutor asked, "So are we talking about some kind of developed opportunism?" Chapman responded affirmatively.

The prosecutor then asked Chapman to define "pedophilia." The definition Chapman supplied tracked that previously given for "paraphilia" with the additional element that the objects of sexual arousal or behavior are "prepubescent children." Chapman testified there was no "clinical" evidence sufficient to make a diagnosis of pedophilia. He explained:

"[T]here is no clinical evidence of the intense recurring sexual interest, fantasies and arousal. It may be there. We have no evidence of it. The only objective [evidence] absent him providing that or some indirect evidence such as a history of stalking and/or obsession with child pornography or something would be *** what we call penile polysmograph which would measure the degree, if any, of sexual arousal by this subject class."

Chapman indicated there was no indication that defendant had possessed child pornography. Chapman was not asked how the restriction he would place upon defendant's future interaction with "prepubescent females" might relate to a diagnosis of pedophilia or, more to the point, the failure to reach that diagnosis.

Chapman was asked for recommendations to "effectuate" compliance with his contingency. Chapman responded, "I presume it would have to be under a mandate of the Court and it would be in the form of a probation status *** with certain restrictions about reporting as living and his work and so forth that would take those things into account." When the prosecutor suggested that truly effective supervision of defendant might entail someone watching him "24 hours a day,"

Chapman responded that global positioning system devices are now available, as are radio frequency ankle bracelets. Chapman acknowledged that a global positioning system would not indicate whether young girls are "in the path" of offenders so monitored. With the conclusion of Chapman's testimony, the sentencing hearing was continued to February 6, 2003.

When the hearing resumed, the court received victim impact statements. One such statement was read in open court by the mother of K.F., and the other was read on behalf of C.D.'s mother by Alicia Dornan of the Children's Advocacy Center.

K.F.'s mother spoke "of the destruction that the defendant's actions [had] caused" in the lives of her daughter and her family. She described K.F. as independent, confident and curious about the world prior to the sexual assault. K.F. loved going to school, church and social events. She had many friends and "always seemed to keep busy meeting new people." She did well in school and was excited to go there each day. She enjoyed reading and was talented in art. At the end of her day, K.F. had no difficulty falling asleep.

After the sexual assault, life "significantly changed and became a struggle for [K.F.] and her family." K.F. has had to cope with "many symptoms of post traumatic stress disorder, including feelings of fear, paranoia, anxiety and seclusion." K.F. would panic when she would see someone with physical features resembling those of the defendant, or hear a voice similar to his. She begged to stay home from normal social events, avoiding crowds because she believed people would stare at her or talk about her. K.F. is no longer independent and obviously suffers from feelings of insecurity. She does not want to be left alone in a room. She wants family members constantly by her side. "She has lived in terror expressing concern that Mr. Huddleston will come after her and harm her."

K.F.'s mother described "numerous nights [when K.F. would] lie awake until the mid-hours of the morning, finally falling asleep only with the comforting thought of protection from her father lying on the floor right next to her bed and her mother at the foot of her bed sleeping in a chair." As of the date of the sentencing hearing, K.F. was still experiencing interrupted sleep patterns.

For K.F., school has changed from "a place of fun and adventure to a dreaded, haunting atmosphere. Almost daily, [K.F.] continues to request to be allowed to stay home from school." Her mother stated that K.F. "will beg to stay home and complains of not feeling well. It is devastating to see her trying to gain the strength and courage she needs just to pull the covers back and step a foot to the floor. This is a little girl who used to love school and wake with energy." K.F. has struggled scholastically. Her mother stated that K.F. now frequently becomes frustrated with assignments and expresses an inability to concentrate. K.F. used to complete her work at school and rarely had to bring work home "because school was top priority." Now, K.F. gives up on assignments, sobbing. She was forced to drop out of art class due to "haunting" memories associated with that class.

K.F.'s mother testified that the consequences wrought by defendant's actions have not been limited to K.F. alone; her entire family has been affected. In particular, K.F.'s older, teenage brother has been withdrawn since the sexual assault of K.F. and has shown a "lack of desire to socialize with other high school friends." He displays a lack of self-esteem that was not evident before the violation of his younger sister. K.F.'s family has gone so far as to relocate so that she can be closer to her best friends in the hope that she will overcome her current tendency to withdraw from social interaction.

K.F.'s mother stated that parenting has become "a nightmare." Something as simple as mention of the

words "peanut butter" or "pudding" may trigger a reaction in K.F. Now, both parents worry constantly about their children and it is difficult to let the children out of their sight for fear of something terrible happening. Trusting others with the children has become almost impossible. That tendency often eliminates opportunities for *all* children in the family. The stress occasioned by the sexual assault has resulted in the physical exhaustion of both parents and a stomach ulcer in the case of K.F.'s mother. On-the-job concentration of both parents has been affected, and both have missed work for counseling, court dates, and for those days when they were called to school because K.F. was having difficulty coping. Although many friends have shown support and offered comfort, K.F.'s family "has also experienced the avoidance *** of others who are unsure of what to say or do. Many times, [K.F.'s] family has chosen to avoid going places of usual frequency to eliminate undue stares and attention. Public appearance remains extremely uncomfortable."

K.F.'s mother stated, "The pain, worry, anger and fear overwhelms a person." K.F.'s parents are concerned about K.F.'s future, and her mother expressed the hope that defendant "will never be allowed the future opportunity to inflict pain and suffering to this extent on another child."

Alicia Dornan read the victim impact statement written by C.D.'s mother. That statement echoes many of the problems and concerns noted in the impact statement read by K.F.'s mother.

C.D.'s mother noted that, prior to the sexual assault, C.D. had been a "very bright, accelerated student. She took advanced classes and brought home excellent grades. She was full of self-confidence and *** humor." She is a completely different child now. C.D. has become very distant and shy. She cannot look people directly in the

face when speaking to them. C.D.'s sense of humor has turned to annoyance. Now, it "seems as though she tries purposely to antagonize to bring on confrontation."

Although she never slept in her parents' bed before, she now does frequently. She has constant nightmares and anxiety. C.D.'s mother explained that C.D. "somehow believes that her bed has all the bad dreams in it from what happened to her. And they keep coming out to remind her every night."

Since defendant sexually assaulted her, C.D. has had a difficult time speaking to men, especially men who resemble defendant. She instantly retreats into silence when she sees someone with defendant's features. C.D. had recently had her first music recital. When her mother later asked her how she felt when it was over, C.D. responded, "You know who was there, don't you?" C.D. had seen a man who strongly resembled defendant, and she was certain he was there at the school. She noted, as she had looked out over the crowd of assembled parents, she had seen "so many men who looked like Mr. Huddleston." C.D.'s mother observed, "what should have been one of the most wonderful[,] memorable nights of her life was ruined. He was there haunting her."

C.D. had related to her mother that she had been having a hard time concentrating on school work and she wanted to be at home more. She complains constantly of stomachaches and throws up at school. Her fears and anxieties magnify in a school setting. Although she never used to cry, now C.D. does often.

Like K.F.'s mother, C.D.'s mother expressed her fears for C.D.'s future:

"How will she deal with commitment and relationship issues as she grows older? Scott Huddleston has taken her childhood innocence. How much of her future has he tainted as well?"

The two victim impact statements were admitted as evidence.

The next witness to testify at defendant's sentencing hearing was his "spiritual counselor," Reverend Steven Anderson. Anderson testified that he first met defendant approximately one year prior, when defendant attended church with his parents, who are very active in Anderson's congregation. Anderson stated he is aware of the offenses of which defendant has been convicted. Anderson had visited defendant in jail on a weekly basis during the period of defendant's incarceration.

Reverend Anderson worked with defendant in a program designed for "sex offenders with Christian beliefs." Anderson testified that the program is intended to help sex offenders take responsibility for what they have done, and to understand that forgiveness does not mean avoidance of consequences. The program also addresses ways in which the offender can avoid recidivism. Reverend Anderson stated his belief that defendant had responded positively to counseling. He had never tried to blame anyone else, and he was sorry for what he had done to the victims and their families, as well as what he had done to his family. Defendant had asked Anderson to pray for him so that he would change and he would not reoffend. Reverend Anderson was asked whether defendant understood why he did what he did. Anderson responded, "I don't know that anyone could understand it. But I believe he is extremely sorrowful that he did it. He understands what he did and that it was wrong." Anderson believed that defendant had been "consistent in his desire to change." Reverend Anderson concluded his testimony by stating his opinion that defendant's words were not simply "a jailhouse conversion for somebody else's benefit."

Joy Mason, defendant's friend and coworker, also testified for the defense. Mason, a second-grade teacher at Westview Elementary School in Fairbury, Illinois, expressed her sorrow for both the victims and their

families, and for defendant and his family. Mason did not, of course, condone defendant's behavior, and she conveyed her "sadness" because defendant "had so much to offer" as a teacher. Defendant had the ability "to help children think positively about themselves, to be creative in their expression of that through art." Defendant made his class "fun and interesting."

Mason considered defendant a friend who was always supportive, a very good listener, and a good advisor. She stated, "He always thinks of others and ways to help them." She said she hoped he would receive a reasonable amount of time for his crime and he would receive help and counseling to help him with his sickness.

Under cross-examination, Mason was asked how she felt about defendant having used his position as a teacher to commit these sexual assaults upon children in his charge. Mason responded, "It makes me angry and frustrated that anything like that could happen. And also aware as a teacher of *** the things that we should all do in the profession to keep children safe."

Defendant's mother, Sidney Huddleston, testified on defendant's behalf. Much of her testimony focused on the love that family members felt for defendant. She brought numerous letters of support from defendant's friends, relatives, neighbors and associates. Defendant's mother spoke of the trauma defendant may have experienced when he was two years old and his father suffered from— but ultimately overcame—a "life-threatening disease." She pointed to a "pretty serious head injury" defendant suffered when he was young and helping his grandfather feed some puppies. She acknowledged that the head injury was not so serious that defendant was admitted to a hospital. Defendant's mother stated that defendant "continued to love his grandfather and love those puppies." She speculated that the head injury may have "contributed to the many learning disabilities that came along later in school."

Mrs. Huddleston testified at length regarding defendant's difficulties in school. She admitted that diagnostic testing at Illinois State University was "not conclusive." Nonetheless, she testified that she continued to receive reports during defendant's early years in elementary school that he was "slow," "not learning at a normal rate," and not paying attention. She admitted that she had heard evaluations of defendant, subsequent to his arrest, that described him as "highly intelligent." Defendant's mother took issue with that description. She stated her belief that defendant is "an average person, average intelligence, smothered by learning disabilities." She testified at length regarding defendant's academic struggles which culminated in a bachelor of science degree from Illinois State University.

Defendant's mother described her son as "a man who touched a lot of lives with a positive influence, especially students who struggled with academics and insecurities." She stated her belief that defendant could "still be of use to God's society if given the opportunity."

After the attorneys spoke to sentencing issues, defendant was given the opportunity to address the court. He expressed sorrow and remorse for his actions, and for the pain he had caused the victims, their families, his coworkers, and his family. He stated his hope that the victims would "move forward and heal in a positive way." Defendant said he was sorry that the victims had to appear before the court for trial; he attributed responsibility to defense counsel who had advised him to proceed in that manner so that he would not waive any of his rights.

The trial judge recessed proceedings for a time, and then returned to announce his decision on the constitutional question reserved for ruling, and on defendant's sentence.

The court first spoke to the circumstances of the offense. The court recognized that defendant had violated

three children and that his "sordid conduct" was "despicable in the extreme." However, the court characterized what defendant had done as *different* from "what usually occurs in cases of molestation of children and probably what some of the things [*sic*] the legislature was concerned about." The court noted:

> "In this case, the children saw nothing. \*\*\* They were told nothing by the defendant that indicated what was happening. There was no torture. There were no threats. There was no intimidation. The children were essentially unaware, in a sense, that this crime was being committed. I think they realized it later. But what we have here is a crime of deceit."

The court questioned whether the State could even have proved that the criminal acts occurred without the oral and written confession of defendant. The court recognized that defendant's confession "removed all that." The court continued: "None of this, however, changes the fact that the defendant acted atrociously and that his victims were individuals to whom he owed a special responsibility."

The court then turned to the issues of defendant's rehabilitative potential and the constitutionality of section 12—14.1(b)(1.2) of the Code. The court noted that defendant was 36 years of age. Other than minor traffic offenses, defendant had one criminal misdemeanor of record. On March 3, 1997, defendant had pled guilty to public indecency and had received a sentence of 12 months' court supervision and a fine of $385. The court observed that defendant's acts had involved "exposure with no physical contact by the defendant with another individual." The court did not specify the nature of the acts in rendering its decision.

The trial court addressed evidence which the court believed supported an inference that defendant could be rehabilitated. The court observed:

> "Taking into account that it is, of course, to his

advantage to be sorry at this time, the evidence before me convinces me that he was and is truly remorseful for his actions. I say that because he did choose to stop what was happening. I think he genuinely recognizes that he has betrayed these children. From the record, he is worried about the loss of faith these children would have in adults." The court perceived in defendant's confession "a desire on the part of the defendant to come clean so he could get treatment." Finally, the court pointed to the testimony of Dr. Chapman that defendant is a "minimal risk" to reoffend. The court did not discuss the conditions Chapman had placed on that assessment.

The court then addressed the mandatory natural life sentencing provision of section 12—14.1(b)(1.2) of the Code:

"So what does this boil down to? The legislature saw fit to pass a sentencing statute that was blanket in nature. If there is one victim, the sentence is six to 30. If there is two [sic] or more, the sentence is natural life. The legislature chose in this case to use a blanket approach for all cases regardless of facts, regardless of circumstances, regardless of any rehabilitative potential on the part of a particular defendant.

That raises the question of how could the legislature validly pass such a statute if the statute ignores rehabilitative potential entirely. And the answer is that such conduct by a defendant where victims are multiple can be so egregious, that life in prison is permissible without recognition of rehabilitative potential."

Although the court indicated that it could "readily visualize scenarios where such an argument would be true," the court concluded it could "not find such to be the circumstance" in this case. The court, therefore, ruled that section 12—14.1(b)(1.2) is unconstitutional as applied to this defendant.

We disagree.

## ANALYSIS

Statutes enjoy a strong presumption of constitution-

ality, and this court has a duty to construe statutes in a manner that upholds their validity whenever reasonably possible. *Hill v. Cowan*, 202 Ill. 2d 151, 157 (2002); *People v. Garcia*, 199 Ill. 2d 401, 402-03 (2002). The party challenging a statute bears the burden of demonstrating its invalidity. *People v. Miller*, 202 Ill. 2d 328, 335 (2002); *Garcia*, 199 Ill. 2d at 402. We review, *de novo*, a circuit court's finding that a statute is unconstitutional. *Miller*, 202 Ill. 2d at 335; *People v. Malchow*, 193 Ill. 2d 413, 418 (2000).

This court has repeatedly recognized that the legislature has the power to prescribe penalties for defined offenses, and that power necessarily includes the authority to prescribe mandatory sentences, even if such sentences restrict the judiciary's discretion in imposing sentences. *Miller*, 202 Ill. 2d at 336; *People v. Taylor*, 102 Ill. 2d 201, 208 (1984). However, the power of the legislature is not without limitation; the penalty prescribed must satisfy constitutional requirements. *Miller*, 202 Ill. 2d at 336.

In the matter before us, the issue is whether section 12—14.1(b)(1.2) of the Code violates the proportionate penalties clause of the Illinois Constitution (Ill. Const. 1970, art. I, § 11). The proportionate penalties clause provides that "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship." Ill. Const. 1970, art. I, § 11. As this court observed in *Taylor*, "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty." *Taylor*, 102 Ill. 2d at 206. Factors to be considered in determining the seriousness of an offense include the degree of harm, the frequency of the crime, and the risk of bodily injury associated with it. *People v. Hill*, 199 Ill. 2d 440, 454 (2002). The legislature may perceive a need

to enact a more stringent penalty provision in order to halt an increase in the commission of a particular crime. *Hill*, 199 Ill. 2d at 454. "As an institution, the legislature is better equipped than the judiciary to identify and remedy the evils confronting our society and is more capable of gauging the seriousness of an offense." *Hill*, 199 Ill. 2d at 454. Consequently, courts will generally defer to the legislature's judgment that a particular offense is more serious than another. *Hill*, 199 Ill. 2d at 454.

This court has utilized three separate tests to determine whether a proportionate penalties clause violation has occurred. First, a penalty violates the proportionate penalties clause if it is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community. *People v. Moss*, 206 Ill. 2d 503, 522 (2003); *Hill*, 199 Ill. 2d at 452. Second, a penalty violates the proportionate penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely. *People v. Moss*, 206 Ill. 2d 503, 522 (2003); *Hill*, 199 Ill. 2d at 452. Finally, the proportionate penalties clause is violated where offenses with identical elements are given different sentences. *Moss*, 206 Ill. 2d at 522; *Hill*, 199 Ill. 2d at 452. In the instant case, defendant contends that the ruling of the trial court can be upheld on the bases that section 12—14.1(b)(1.2) fails the first two tests.

Before we address the merits, we acknowledge, and reject, the State's request that we reconsider our holding in *People v. Miller*, 202 Ill. 2d 328 (2002). In *Miller*, a unanimous court held that section 5—8—1(a)(1)(c)(ii) of the Unified Code of Corrections (730 ILCS 5/5—8—1(a)(1)(c)(ii) (West 1996)) was unconstitutional "as applied" to that defendant. However, the *Miller* case is readily distinguishable from the present case. In *Miller*,

there was a rare convergence of several factors, including: the defendant was a 15-year-old juvenile who, by statute, was automatically transferred for trial as an adult; the defendant was tried under an accountability theory which, by statute, holds all participants with a common criminal design equally responsible; and the applicable multiple-murder sentencing statute does not allow consideration of the defendant's age or extent of participation in the crime. *Miller*, 202 Ill. 2d at 340. The defendant had served as a lookout during the encounter, and the circuit court described the defendant's role in the crime as " 'passive accountability.' " *Miller*, 202 Ill. 2d at 331. When affirming the finding that the mandatory life sentence was unconstitutionally disproportionate as applied to the defendant, we noted,

> "a mandatory sentence of natural life in prison with no possibility of parole grossly distorts the factual realities of the case and does not accurately represent defendant's personal culpability such that it shocks the moral sense of the community. This moral sense is particularly true, as in the case before us, where a 15-year-old with one minute to contemplate his decision to participate in the incident and stood as a lookout during the shooting, but never handled a gun, is subject to life imprisonment with no possibility of parole—the same sentence applicable to the actual shooter." *Miller*, 202 Ill. 2d at 341.

A holding that a statute is unconstitutional as applied does not broadly declare a statute unconstitutional but narrowly finds the statute unconstitutional under the specific facts of the case. See *Hill v. Cowan*, 202 Ill. 2d 151, 158 (2002). The present case does not include the age and level of culpability concerns that we found supported the as-applied unconstitutionality finding in *Miller*. In addition, while recognizing the convergence of several unusual circumstances in *Miller*, we in no way weakened the well-established principle that review of a constitutional issue begins with a presumption that the statute is constitutional. *Miller*, 202 Ill. 2d at 335. In

fact, "[i]t is a court's duty to construe a statute so as to affirm the statute's constitutionality and validity, if reasonably possible." *People v. Shephard*, 152 Ill. 2d 489, 499 (1992). Therefore, we decline to revisit *Miller* in light of this case.

Nonetheless, we begin by considering whether the sentencing provision in question "is cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community" (*Moss*, 206 Ill. 2d at 522). Because the parties' briefs were somewhat lacking in this regard, we have conducted independent research on this issue, and what follows is the product of that inquiry. Although it is not suggested that the result is comprehensive or all-inclusive, we believe it is informative and pertinent to our disposition of this case. We address, first, the seriousness of sex offenses against children and, in particular, the degree of harm to the child victims and the frequency of the crimes.

Sixty years ago, the United States Supreme Court enunciated a principle as simple and self-evident as it is critical and compelling: "A democratic society rests, for its continuance, upon the healthy, well-rounded growth of young people into full maturity as citizens ***." *Prince v. Massachusetts*, 321 U.S. 158, 168, 88 L. Ed. 645, 653, 64 S. Ct. 438, 443 (1944). In furtherance of that principle, the Court has "sustained legislation aimed at protecting the physical and emotional well-being of youth even when the laws have operated in the sensitive area of constitutionally protected rights." *New York v. Ferber*, 458 U.S. 747, 757, 73 L. Ed. 2d 1113, 1122, 102 S. Ct. 3348, 3354 (1982). In that regard, the Court has proclaimed the "prevention of sexual exploitation and abuse of children *** a government objective of surpassing importance." *Ferber*, 458 U.S. at 757, 73 L. Ed. 2d at 1123, 102 S. Ct. at 3355.

As was noted in *People v. Wooters*, 188 Ill. 2d 500, 509

(1999), this state has traditionally exhibited an "acute interest" in the well-being of minors. Indeed, "the welfare and protection of minors has always been considered one of the State's most fundamental interests." *American Federation of State, County & Municipal Employees v. Department of Central Management Services*, 173 Ill. 2d 299, 311 (1996). Long ago, this court acknowledged the paramount importance of ensuring the welfare of children, and others, who are least able to protect themselves:

> "It is the unquestioned right and imperative duty of every enlightened government, in its character of *parens patriae*, to protect and provide for the comfort and well-being of such of its citizens as, by reason of infancy, defective understanding, or other misfortune or infirmity, are unable to take care of themselves. The performance of this duty is justly regarded as one of the most important of governmental functions, and all constitutional limitations must be so understood and construed as not to interfere with its proper and legitimate exercise." *County of McLean v. Humphreys*, 104 Ill. 378, 383 (1882).

Concern for the welfare and safety of children is reflected in various criminal statutes and procedural enactments based upon the victim's age or youth. Our legislature has created offenses on that basis, elevated or differentiated the classification of existing offenses, allowed for sentence enhancement, and relaxed evidentiary rules. See generally 720 ILCS 5/11—9.3 (West 2002) (prohibiting child sex offenders from being present within a school zone); 720 ILCS 5/11—9.4 (West 2002) (prohibiting child sex offenders from approaching, contacting or communicating with a child within a public park); 720 ILCS 5/12—14.1(a)(1) (West 2002) (predatory criminal sexual assault of a child); 730 ILCS 5/5—5—3.2(b)(4)(i) (West 2002) (making a defendant eligible for an extended-term sentence based upon the young age of the victim); 725 ILCS 5/115—7.3 (West 2002) (allowing admission of other-crimes evidence in prosecution of sex offenders);

725 ILCS 5/115—10(a)(2) (West 2002) (allowing testimony of a child's out-of-court statement describing a sexual act perpetrated upon the child). The sentencing provision at issue in the instant case was obviously intended to protect this vulnerable segment of our society from sexual predation by deterring would-be offenders and ensuring that those who commit sexual acts with multiple victims will not have the opportunity to reoffend.

The vulnerability of children to sexual predation has been a topic of considerable commentary in recent years, as has the psychological damage that results to the developing psyches of these young victims. See M. Meister, Note, *Murdering Innocence: The Constitutionality of Capital Child Rape Statutes*, 45 Ariz. L. Rev. 197, 209 (Spring 2003); N. Yell, Comment, *The California Sexually Violent Predator Act and the Failure to Mentally Evaluate Sexually Violent Child Molestors*, 33 Golden Gate U. L. Rev. 295 (2003); R. Whitcombe, Note, *Child Sexual Abuse: Adult Survivors, Repressed Memories, and Stories Finally Told*, 11 UCLA Women's L.J. 255, 259 (Spring-Summer 2001); J. Broughton, Note, *"On Horror's Head Horrors Accumulate": A Reflective Comment on Capital Child Rape Legislation*, 39 Duq. L. Rev. 1, 35-8 (2000); B. Palmer, Note, *Death as a Proportionate Penalty for the Rape of a Child: Considering One State's Current Law*, 15 Ga. St. U. L. Rev. 843, 858-59, 863-66 (1999); S. Ketring & L. Feinauer, *Perpetrator-Victim Relationship: Long-term Effects of Sexual Abuse for Men and Women*, 27 Am. J. Fam. Therapy 109, 117 (1999); Y. Glazer, *Child Rapists Beware! The Death Penalty and Louisiana's Amended Aggravated Rape Statute*, 25 Am. J. Crim. L. 79, 86-88 (1997); A. Lurigio, *Child Sexual Abuse: Its Causes, Consequences, and Implications for Probation Practice*, 59 Fed. Probation 69, 69-71 (1995); L. Schafran, *Maiming the Soul: Judges, Sentencing, and*

*the Myth of the Nonviolent Rapist,* 20 Fordham Urb. L.J. 439, 441 (1993) (arguing that the idea of a "nonviolent" rapist is fictional and that "[j]udges and attorneys must expand their definitions to include injury to the victim's psyche"); I. Prager, *"Sexual Psychopathy" and Child Molesters: The Experiment Fails,* 6 J. Juv. L. 49, 62-63 (1982); C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990); Handbook on Sexual Abuse of Children 6-7 (1988).

Commentators have recognized that, aside from any *physical* injury a child may suffer in a sexual assault, children who are sexually assaulted are subject to chronic *psychological* problems that may be even more pernicious. Sexual assault (rape) has been described as, "[s]hort of homicide, *** the 'ultimate violation of self.' " *Coker v. Georgia,* 433 U.S. 584, 597, 53 L. Ed. 2d 982, 992-93, 97 S. Ct. 2861, 2869 (1977), quoting U.S. Dep't of Justice, Law Enforcement Assistance Administration Report, Rape and Its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies 1 (1975). Although the aftermath for an adult victim can be devastating and long-term (see 39 Duq. L. Rev. at 35-37; 25 Am. J. Crim. L. at 86-87), the impact on a child can be even more profound. Because of their emotional immaturity, children are exceptionally vulnerable to the effects of sexual assault. 45 Ariz. L. Rev. at 209; 39 Duq. L. Rev. at 38. Long-term follow-up studies with child sexual abuse victims indicate that sexual abuse is " 'grossly intrusive in the lives of children and is harmful to their normal psychological, emotional and sexual development in ways which no just or humane society can tolerate.' " 25 Am. J. Crim. L. at 87, quoting C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 2 (1990). The child's life may be forever altered by residual problems associated with the event. 45 Ariz. L. Rev. at 209; 15 Ga. St. U. L. Rev. at 843.

Studies indicate that as many as 40% of preadolescent sexual assault victims are considered "seriously disturbed." 59 Fed. Probation at 70. Psychopathology and mental disorders often follow the child into adulthood. 45 Ariz. L. Rev. at 209; 15 Ga. St. U. L. Rev. at 864; 59 Fed. Probation at 70. Psychological problems associated with sexual assault or abuse include sudden school failure, unprovoked crying, dissociation, depression, insomnia, sleep disturbances, nightmares, feelings of guilt and inferiority, poor self-esteem, and self-destructive behavior, including an increased incidence of attempted suicide. 45 Ariz. L. Rev. at 209; 39 Duq. L. Rev. at 38; 25 Am. J. Crim. L. at 88. Beyond the compassion one must feel for these innocent victims, pragmatism dictates a recognition that the victim's problems are likely to become society's problems. Correlations have been noted between child sexual abuse and problems in adulthood such as substance abuse, dangerous sexual behaviors or dysfunction, inability to relate to others on an interpersonal level, and psychiatric illness. 39 Duq. L. Rev. at 38; 25 Am. J. Crim. L. at 89; 59 Fed. Probation at 70-71; C. Bagley & K. King, Child Sexual Abuse: The Search for Healing 53 (1990); Handbook on Sexual Abuse of Children 7 (1988). The harm to the child victim of sexual abuse—and to society itself—is well documented. We now consider the prevalence and frequency of the offense.

"Child sexual abuse is prevalent in America. From 1976 to 1986, the number of reported cases of child sexual abuse grew from 6,000 to 132,000, an increase of 2100%. By 1991, the number of cases totaled 432,000, an increase of another 227% (United States Department of Health and Human Services, 1992)." 59 Fed. Probation at 69. "From 1980 to 1994, sex offenders was the fastest-growing category of violent criminal." J. Smulin, *Protecting Life and Liberty: The Constitutionality and Necessity of Civil Commitment of Sexual Predators*, 52 DePaul L.

Rev. 1245, 1247 (2003), citing U.S. Dep't of Justice, Bureau of Justice Statistics, Sex Offenses and Offenders 109 (1997). Most cases never come to the attention of law enforcement or treatment professionals. 59 Fed. Probation at 69; see also J. Peters-Baker, *Challenging Traditional Notions of Managing Sex Offenders: Prognosis is Lifetime Management*, 66 UMKC L. Rev. 629, 638 (1998) (a large percentage of sexual assault victims never report the crime). Some experts estimate that less than one-third of all sexual abuse or assault cases are actually reported and investigated by child protective authorities. 45 Ariz. L. Rev. at 198, citing 15 Ga. St. U. L. Rev. at 844, citing J. Treanor, *Orchestrating the Successful Prosecution of Child Sexual Abuse Cases*, 39 A.F. L. Rev. 277, 278 (1996). Other authorities suggest that the chance of being apprehended for child molestation may be as low as 3%. 52 DePaul L. Rev. at 1248; G. Abel, *Self-Reported Sex Crimes of Non-incarcerated Paraphiliacs*, 2 J. Interpersonal Violence 3 (1987). Suffice it to say that the incidence of child molestation is a matter of grave concern in this state and others, as is the rate of recidivism among the offenders.

As the United States Supreme Court recently reiterated in *Connecticut Department of Public Safety v. Doe*, 538 U.S. 1, 4, 155 L. Ed. 2d 98, 103, 123 S. Ct. 1160, 1163 (2003):

" 'Sex offenders are a serious threat in this Nation.' *McKune v. Lile*, 536 U.S. 24, 32 (2002) (plurality opinion). '[T]he victims of sex assault are most often juveniles,' and '[w]hen convicted sex offenders reenter society, they are much more likely than any other type of offender to be rearrested for a new rape or sex assault.' Id., at 32-33."

In *McKune*, the Supreme Court described the risk of recidivism posed by sex offenders as "frightening and high." *McKune v. Lile*, 536 U.S. 24, 34, 153 L. Ed. 2d 47, 57, 122 S. Ct. 2017, 2025 (2002).

As we recently acknowledged in *People v. Donoho*,

204 Ill. 2d 159, 174 (2003), our legislature has responded again and again to the propensity of sex offenders to repeat their crimes and to increases in the incidence of sexual assault and abuse cases. See also *People v. Stork*, 305 Ill. App. 3d 714, 721 (1999) (quoting a legislative declaration referring to " 'the high recidivism rate of child sex offenders' "), quoting 90th Ill. Gen. Assem., House Bill 157, 1997 Sess. Similar declarations can be found in the statutes of numerous other states. See C. Champagne, Case Note, *Sex Offender and Notification Statutes & The Illinois Supreme Court's Decision in People v. Malchow*, 22 QLS 301, 308 n.64 (2003) (compilation of statutory declarations).

Although there is considerable debate over the degree to which treatment of sex offenders may be effective, it *is* clear that state legislatures may respond to what they reasonably perceive as a "substantial risk of recidivism." See *Smith v. Doe*, 538 U.S. 84, 103, 155 L. Ed. 2d 164, 183-84, 123 S. Ct. 1140, 1153 (2003) ("Alaska could conclude that a conviction for a sex offense provides evidence of substantial risk of recidivism. The legislature's findings are consistent with grave concerns over the high rate of recidivism among convicted sex offenders and their dangerousness as a class"). State legislatures have addressed this substantial risk of child sex offender recidivism in many different ways. Some statutes seek to protect children once an offender is released from state custody by monitoring or restricting his or her movement and access to children. Other enactments call for longer sentences of imprisonment, so that the offender's opportunity to reoffend is foreclosed during the period of incarceration.

For example, every state in the nation has enacted a version of "Megan's Law," requiring, *inter alia*, registration and monitoring of sex offenders who are released into the community. *Smith*, 538 U.S. at 90, 155 L. Ed. 2d

at 175, 123 S. Ct. at 1145. At least 12 states have enacted some form of residency restriction applicable to sex offenders. See Ala. Code § 15—20—26 (Supp. 2000) (restricts sex offenders from residing or accepting employment within 2,000 feet of school or child care facility); Ark. Code Ann. § 5—14—128 (Lexis Supp. 2003) (unlawful for level three or four sex offenders to reside within 2,000 feet of school or day-care center); Cal. Pen. Code § 3003 (Deering Supp. 2004) (parolees may not live within 35 miles of victim or witnesses, and certain sex offenders on parole may not live within a quarter mile from a primary school); Fla. Stat. Ann. § 947.1405(7)(a)(2) (West 2001) (released sex offender with victim under 18 prohibited from living within 1,000 feet of a school, day-care center, park, playground, or other place where children regularly congregate); Ga. Code Ann. § 42—1—13 (Supp. 2003) (sex offenders required to register shall not reside within 1,000 feet of any child care facility, school, or area where minors congregate); 720 ILCS 5/11—9.3(b—5) (West 2002) (child sex offenders prohibited from knowingly residing within 500 feet of schools); Ky. Rev. Stat. Ann. § 17.495 (Banks-Baldwin 2000) (registered sex offenders on supervised release shall not reside within 1,000 feet of school or child care facility); La. Rev. Stat. Ann. § 14:91.1 (West Supp. 2004) (sexually violent predators shall not reside within 1,000 feet of schools unless permission is given by school superintendent); Ohio Rev. Code Ann. § 2950.031 (Lexis 2003) (sex offenders prohibited from residing within 1,000 feet of school); 57 Okla. Stat. § 590 (2003) (prohibits sex offenders from residing within 2,000 feet of schools or educational institutions); Or. Rev. Stat. §§ 144.642, 144.643 (1999) (incorporates general prohibition on supervised sex offenders living near places where children reside); Tenn. Code Ann. § 40—39—111 (2003) (sex offenders prohibited from establishing residence

within 1,000 feet of school, child care facility, or victim). Many jurisdictions restrict the offender's movements in other ways, similar to the Illinois statutes we have previously mentioned. See 720 ILCS 5/11—9.3 (West 2002); 720 ILCS 5/11—9.4 (West 2002). Perhaps the most common means of protecting children are statutes providing for enhanced classification of sex offenses and/or sentences, based upon the age of the victim. The rationale for these statutes is undoubtedly specific and general deterrence: the chances of the offender violating other children while incarcerated is nonexistent; and others might be deterred by the lengthy sentences of those incarcerated. In this regard, we are aware of many states that impose mandatory life sentences upon repeat sex offenders. Illinois, of course, has such statutes. See 720 ILCS 5/12—14(d)(2) (West 2002) (natural life imprisonment for a second or subsequent offense); 720 ILCS 5/12—14.1(b)(2) (West 2002) (same).

While several state statutes *authorize* a life sentence—with or without parole—for a perpetrator's *first* sexual assault of a child, at least five states, including Illinois, would *require* a sentence of mandatory life imprisonment, under certain circumstances. Ohio requires the imposition of a sentence of life imprisonment where the offender compels a victim less than 13 years of age to submit to felonious sexual penetration "by force or threat of force." Ohio Rev. Code Ann. § 2907.02(B) (Lexis 2003). An earlier version of the statute was upheld against a proportionality challenge in *State v. Gladding*, 66 Ohio App. 3d 502, 513, 585 N.E.2d 838, 845 (1990) ("In this case, considering the heinousness of the crime of raping a nine-year-old child, it cannot be said that appellant's sentence was disproportionate or shocking to the moral sense of the community"). Florida and North Carolina have statutes that mandate the imposition of a sentence of life imprisonment for "capital sexual bat-

tery" and "first-degree sexual offense," respectively, neither of which requires the use of force or threat of force. These provisions have survived repeated proportionality challenges. See *Adaway v. State*, 864 So. 2d 36, 37-38 (Fla. 2003); *Jones v. State*, 861 So. 2d 1261, 1263 (Fla. 2003); *Gibson v. State*, 721 So. 2d 363, 369-70 (Fla. 1998); *State v. Higginbottom*, 312 N.C. 760, 763-64, 324 S.E.2d 834, 837 (1985); *State v. Bartlett*, 153 N.C. App. 680, 688-89, 571 S.E.2d 28, 33-34 (2002). Louisiana authorizes the death penalty for the offense of aggravated rape, which includes the rape of a child under 12 years old. A defendant who does not receive the death penalty is subject to a mandatory life sentence. La. Rev. Stat. § 14:42 (West Supp. 2004). Although the constitutionality of state statutes that impose the death penalty for non-homicide crimes is the subject of debate (see 45 Ariz. L. Rev. at 210-12; D. Schaaf, *What If the Victim Is a Child? Examining the Constitutionality of Louisiana's Challenge to Coker v. Georgia*, 2000 U. Ill. L. Rev. 347, 365-67), the Louisiana Supreme Court has upheld Louisiana's sentencing scheme.

We return to the first question posed at the outset of our discussion: Is a sentence of natural life imprisonment, as applied to this defendant, cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community? Having applied the appropriate criteria for review of this question, having taken account of the pertinent considerations relevant to this type of offense and enactments in other jurisdictions, and having considered the facts of defendant's case, we cannot say that it is. We now speak to the circumstances attending the commission of these offenses.

Defendant committed sexual assaults against three victims, one more than the minimum section 12—14.1(b)(1.2) requires for imposition of a natural life

sentence. We note that the first assault occurred at least one month prior to the subsequent assaults; thus, there was a period of time during which defendant could have reflected upon the gross impropriety of his actions and refrained from further violations of children under his supervision. Unfortunately for the latter two victims, he did not.

Although defendant did not have a prior felony conviction when he committed these offenses, he *had* previously committed an offense characterized as a "sex offense" in the Criminal Code. See 720 ILCS 5/11—9 (West 1996) (public indecency included among article 11 sex offenses). The presentence report refers to the victim's statement in that case, indicating that defendant, on three separate occasions, stood in the doorway of his apartment, which faced hers, and while nude, "flopped his penis back and forth." The commission of these offenses is obviously a marked escalation of defendant's preexisting deviant tendencies. Defendant's previous encounter with the legal system did nothing to deter him.

Defendant's sexual fixation is further evinced by the discovery of pornographic materials in his file cabinet at the school. It would be reasonable to assume that defendant looked at these materials during the course of the school day. While these materials—including female underwear, Playboy magazines, pornographic pictures, pornographic playing cards, a pornographic catalog, a video tape containing, in part, a pornographic movie, and 48 computer discs, 28 of which contained pornography—portrayed only *adults*, it is impossible for us to believe defendant's assertion that he never fantasized about sexual activity with children prior to the commission of these offenses. In his written statement, defendant *admits* he was sexually aroused during the assault of the third victim. Whence came defendant's desire to place

his penis in the mouth of a 10-year-old girl? Having done it once, whence came the urge to do it to additional children? Defendant's acts do not strike us as impulsive; rather, the commission of these offenses appears to have been the result of planning and well-orchestrated execution, on two separate dates, a month apart.

These observations bring us to Dr. Chapman's testimony. Chapman testified that the "clinical" evidence was not sufficient to make a diagnosis of "paraphilia and/or its subcategory, pedophilia." He conceded, "It may be there." In that regard, we find Chapman's risk assessment of defendant more than a little perplexing. Chapman testified that defendant is a "minimal risk" to reoffend so long as he is restricted from a "position of authority, power or trust with prepubescent females." If defendant is not attracted to prepubescent females, and is not a danger to them, why is there a need to, essentially, restrict his access to them? According to this reasoning, a man thrice convicted of raping women might be a "minimal risk" to reoffend so long as he is not given access to women. It seems to us, this kind of recommendation perverts the very purpose of risk assessment. Chapman acknowledged that defendant should not be a teacher, a baby-sitter, or in any situation where he is in a position of authority. We take this to mean that defendant should never be alone with children, because he could then seek to exercise the inherent authority that an adult can exert over a child. We recognize, of course, that defendant *did* utilize his position of authority and supervision over the children to commit these offenses—an aggravating factor in defendant's case. See 730 ILCS 5/5—5—3.2(a)(14) (West 2002).

We accord *significant* weight to the seriousness of defendant's conduct. We are not convinced that any rehabilitative potential he may have outweighs what he has done to the victims. The circuit court made much of

the fact that the victims were blindfolded when the sexual acts were committed, referring to the admittedly "sordid" and "despicable" acts as "crimes of deceit," as if this were somehow mitigating. We think otherwise. The children are well aware of what happened to them. From the victim impact statements it is clear that they exhibit many classic symptoms of sexual abuse. We fail to see how their prognosis is any better than other sexual assault victims. The circuit court also stated that defendant had taken responsibility for his actions and had shown remorse:

> "Taking into account that it is, of course, to his advantage to be sorry at this time, the evidence before me convinces me that he was and is truly remorseful for his actions. I say that because he did choose to stop what was happening. I think he genuinely recognizes that he has betrayed these children. From the record, he is worried about the loss of faith these children would have in adults."

The court is correct: it *is* to the defendant's advantage to express remorse. He perhaps recognized that at the time he gave his statement to police and in allocution at sentencing. He appears to have overlooked it in his presentence report statement. We are at a loss to explain what the circuit court meant when it commented that defendant chose "to stop what was happening." Defendant did not turn himself in to authorities after the third sexual assault. He did not seek counseling or treatment. When the investigators of these matters came to *him*, defendant initially denied the allegations. His concern for the children was first expressed some time *after* the authorities confronted him with the allegations. Defendant "stopped what was happening" with the third victim—in a physical sense—the same way he "stopped" with his first two victims: he withdrew his penis from the victim's mouth. In the third incident, a knock on the door of the classroom may have had something to do with it as well. However, to suggest, as defendant did,

that he realized "how wrong" his conduct was only after he became "aroused" during the third sexual assault, strains credulity beyond the breaking point. Moreover, defendant really had no opportunity to commit further sexual assaults. Soon after the third sexual assault, school personnel became suspicious and the matter was turned over to law enforcement authorities for investigation.

Even *if* defendant is truly remorseful, that is hardly a determinative factor with respect to the prospect of rehabilitation. A court may well find that the seriousness of the offense outweighs any expression of sorrow. See *People v. Fyke*, 190 Ill. App. 3d 713, 721 (1989). Moreover, remorse may be part of a cycle in which the sex offender ultimately returns to his deviant behavior. See *People v. Lintz*, 245 Ill. App. 3d 658, 668 (1993). If the circuit court really believed that the 36-year-old defendant possessed significant rehabilitative potential, sentences that would permit his earliest release from prison at age 61 would seem to be an odd way of showing it. As this court observed in *Taylor*, "there is no indication [in our constitution] that the possibility of rehabilitating an offender was to be given greater weight and consideration than the seriousness of the offense in determining a proper penalty." *Taylor*, 102 Ill. 2d at 206. Having considered all relevant factors for purposes of the first test of proportionality, we cannot say that the legislature's mandated sentence is unconstitutional as applied to this defendant. Given that determination, it obviously follows that the statute is constitutional on its face. "[S]o long as there exists a situation in which a statute could be validly applied, a facial challenge must fail." *Hill*, 202 Ill. 2d at 157.

We now turn to the contention that the statute violates the second proportionality test. For purposes of the second test, a penalty violates the proportionate

penalties clause where similar offenses are compared and conduct that creates a less serious threat to the public health and safety is punished more severely. *Moss*, 206 Ill. 2d at 522. The cross-comparison analysis of the second test involves a potential two-step inquiry, depending on the answer to the first question: (1) whether the offenses being compared share a common statutory purpose (*People v. Lombardi*, 184 Ill. 2d 462, 476 (1998); *Moss*, 206 Ill. 2d at 522); and (2) if the purposes are related, whether the less serious offense is punished more harshly than the more serious offense (*Lombardi*, 184 Ill. 2d at 475-76). The defendant offers for comparison the offense of aggravated battery of a child. We reject defendant's argument because we do not believe the offenses of predatory criminal sexual assault of a child, and aggravated battery of a child, share a common statutory purpose.

Defendant argues that aggravated battery of a child is a more serious offense because it requires conduct resulting in "great bodily harm" or "permanent disability or disfigurement" (720 ILCS 5/12—4.3(a) (West 2002)) whereas predatory criminal sexual assault of a child "does not require or contemplate" such harm to the victim. In addition, defendant suggests that the legislature must have considered the conduct proscribed by section 12—4.3 of the Code more prevalent because "aggravated battery of a child has been a crime since 1981, and predatory criminal sexual assault was not a crime until 1996." The latter disingenuous assertion, of course, ignores the fact that the pertinent elements of the offense of predatory criminal sexual assault were previously criminalized in the aggravated criminal sexual assault statute.

In any event, we believe our previous lengthy discussion of the problems associated with sexual assaults upon children adequately refutes defendant's contentions

regarding the comparative seriousness of these two offenses. Defendant would minimize what happened to the victims. Defendant states that his acts "were not even immediately recognized by the children as unlawful" and did not cause them "any physical harm." Defendant would have us accept the "fiction" of the "nonviolent" rapist (see Fordham Urb. L.J. at 441) and ignore the devastating injury inflicted upon a child's developing psyche. We reiterate the words of the Supreme Court from *Coker*, describing rape as "[s]hort of homicide, *** the 'ultimate violation of self.' " *Coker*, 433 U.S. at 597, 53 L. Ed. 2d at 992-93, 97 S. Ct. at 2869, quoting U.S. Dep't of Justice, Law Enforcement Assistance Administration Report, Rape and Its Victims: A Report for Citizens, Health Facilities, and Criminal Justice Agencies 1 (1975).

The psychological injury suffered by a child victim of sexual assault is different in kind from injuries sustained by a battered child. Moreover, it appears from our research that sexual assaults upon children are occurring with increasing frequency and have justifiably become a matter of nationwide concern. Unlike the offender who batters a child, a sexual predator is more likely to seek out multiple victims and more likely to reoffend. The purpose of statutes like the aggravated criminal sexual assault statute, and the predatory criminal sexual assault statute, is to "protect victims from, and punish perpetrators for, sexually harmful and offensive conduct." *People v. Sanchez*, 344 Ill. App. 3d 74, 82 (2003) (addressing, *inter alia*, the differing purposes of the aggravated criminal sexual assault and the female genital mutilation statutes). The purpose of the aggravated battery of a child statute is obviously to protect children from bodily harm associated with a battery. Because the purposes of the predatory criminal sexual assault statute and the statute proscribing aggravated battery of a child are dif-

ferent, comparison for purposes of proportionality review is inappropriate.

For the foregoing reasons, we conclude that section 12—14.1(b)(1.2) of the Code is constitutional as applied to this defendant. We reverse the judgment of the circuit court and remand the cause for resentencing.

*Reversed and remanded.*