NOTICE
This Order was filed under
Supreme Court Rule 23 and is
not precedent except in the
limited circumstances allowed
under Rule 23(e)(1).

2023 IL App (4th) 220346-U

NO. 4-22-0346

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

FILED
May 9, 2023
Carla Bender
4th District Appellate
Court, IL

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from the |
| Plaintiff-Appellee, | ) | Circuit Court of |
| v. | ) | Peoria County |
| MICHA ROY GORDON, | ) | No. 21CF533 |
| Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | John P. Vespa, |
| | ) | Judge Presiding. |

JUSTICE TURNER delivered the judgment of the court.
Justices Cavanagh and Harris concurred in the judgment.

**ORDER**

¶ 1     *Held*:   Defendant's 50-year prison sentence for first degree murder was not excessive.

¶ 2     In August 2021, a grand jury indicted defendant, Micha Roy Gordon, with two counts of first degree murder (720 ILCS 5/9-1(a)(1), (a)(2) (West 2020)).  After a January 2022 trial, the jury found defendant guilty on both counts.  Defendant filed a motion for a judgment notwithstanding the verdict or, in the alternative, for a new trial.  At an April 13, 2022, hearing, the Peoria County circuit court denied defendant's posttrial motion and sentenced him to a single prison term of 50 years.  Defendant filed a motion for reconsideration of his sentence, which the court denied.

¶ 3     Defendant appeals, asserting his 50-year sentence was excessive because the trial court failed to adequately consider his remorse and other mitigating evidence reflective of his rehabilitative potential.  We affirm.

¶ 4                                    I. BACKGROUND

¶ 5          Count I of the August 31, 2021, indictment asserted defendant, without legal justification, knowingly struck Rolando Westbrook with a knife knowing said act created a strong probability of death or great bodily harm to Westbrook, causing Westbrook's death.  See 720 ILCS 5/9-1(a)(2) (West 2020).  Count II asserted defendant, without lawful justification and with the intent to kill Westbrook, struck Westbrook with a knife, thereby causing Westbrook's death.  See 720 ILCS 5/9-1(a)(1) (West 2020).

¶ 6          On January 18, 2022, the trial court commenced defendant's jury trial.  The State presented the testimony of the following witnesses:  (1) Jadakiss Pickett, an eyewitness; (2) Roger Pickett, Jadakiss's brother and Westbrook's friend; (3) Juanasia Fuller, a friend of Jadakiss and Roger; (4) Dr. Amanda Youmans, the forensic pathologist who performed Westbrook's autopsy; (5) William England, a Peoria police sergeant; (6) Jenna Long, a Peoria police officer; (7) Zachary Jackson, a Peoria police officer; (8) Gerald Suelter, a Peoria police officer; (9) Clint Rezac, a Peoria police detective; (10) Roberto Vasquez, a Peoria police detective; (11) Scott Bowers, a Peoria police officer; (12) John Briggs, a Peoria police officer; and (13) Clay Blum, a Peoria police officer.  The State also presented numerous photographs and surveillance videos.

¶ 7          Defendant testified on his own behalf and presented two stipulations.  The first stipulation was defendant received medical care on August 24, 2021, and medical personnel observed a three-centimeter stab wound to his left arm, a skin tear to his left pinky, and "a small healed cut to the right side of his head."  The second stipulation addressed Westbrook's convictions and noted he had two misdemeanor battery convictions in 2009 and one in 2020. Westbrook also had two felony domestic battery convictions in 2010 and two misdemeanor

domestic battery convictions in 2020. The evidence relevant to the issue on appeal follows.

¶ 8 Around 3 a.m. on August 24, 2021, Jadakiss, Roger, Fuller, Westbrook, and a couple of other people were drinking and partying at Taft Homes in Peoria, Illinois. A separate group of people were also partying and drinking nearby. One of the men in the other group was wearing all white and had a dog with him. Roger identified defendant in the courtroom as the man who was wearing all white that night.

¶ 9 At some point, Jadakiss and Fuller left to sit in a vehicle, and Roger was near that vehicle. While they were there, Jadakiss and Fuller observed an altercation between Westbrook and defendant. Jadakiss recorded some of the altercation with her cellphone camera. A man in a red shirt was standing in between Westbrook and defendant preventing them from physically touching. Neither woman saw physical contact between defendant and Westbrook, but Jadakiss testified she saw defendant try to swing at Westbrook. Both Jadakiss and Fuller saw something in defendant's hand but could not identify what it was. Jadakiss denied telling the police it was a boxcutter in defendant's hand. Fuller testified Westbrook did not have a weapon. Jadakiss testified she heard Westbrook say he did not want to fight. The last words Jadakiss heard Westbrook say were "leave me alone." After the altercation ended, Westbrook left and started walking up the sidewalk that led out of Taft Homes. Defendant walked in the same direction as Westbrook. Fuller testified defendant continued to walk behind Westbrook until he was out of her eyesight.

¶ 10 Later, the group learned Westbrook had been killed, and Jadakiss, Roger, and Fuller went to Jefferson Street. They observed Westbrook's body lying in the street, and the police were present. Jadakiss showed the police the video she had of a portion of the altercation between defendant and Westbrook. Jadakiss tried to e-mail the video to the police, but she was

unsuccessful. Jadakiss deleted the video from her cellphone, and the police were unable to recover it.

¶ 11        Sergeant England testified he was dispatched to the 700 block of Jefferson Street at 3:57 a.m. and was the first officer on the scene. When he arrived, Sergeant England observed a man lying in a pool of blood in the street near Warren Danz's law office. Sergeant England determined the man was deceased. While on the scene, he spoke with Jadakiss, who had a video on her cellphone. Both he and Officer Long watched the video, but they were unsuccessful in obtaining it from Jadakiss. Sergeant England also searched the area of the scene for a weapon and a blood trail but did not find either.

¶ 12        Officer Long testified she recognized the deceased man in the video played by Jadakiss. The video showed two males fighting at Taft Homes and a third man trying to "deescalate the situation." Officer Long observed a shiny gray object in the hand of the man wearing white and having a dog. The man in white also made a movement towards the victim. Additionally, Officer Long testified Jadakiss told her the man in white had a knife or a box cutter and that man followed the victim out of Taft Homes.

¶ 13        Detective Vasquez testified he examined Westbrook's body at the scene with the coroner and they found no weapons of any type on Westbrook's body. He also had officers gather surveillance videos from Taft Homes, Danz's law office, and buildings between those two locations. None of the surveillance videos recorded the actual stabbing. However, the State played portions of the surveillance videos for the jury. One video showed Westbrook running away from defendant as he left Taft Homes and crossed Adams Street. The video from Miracle Revival Church showed defendant pursuing Westbrook, and the video from Warren Danz's office showed defendant and his dog cross Jefferson Street and walk away from the area.

¶ 14        Detective Vasquez also testified that, later in the day on August 24, 2021, the police executed a search warrant of defendant's residence. The police also transported defendant to the hospital because he was injured. After defendant was treated, he went to the police station where Detective Vasquez along with Detective Rezac interviewed him. During the interview, defendant said he was having a few beers at Taft Homes by himself. As he was leaving, a man he had never seen before came up to him and tried to rob him. Defendant continued his walk, and the man ran up behind defendant and pushed him. When defendant turned around, the man hit him, cut him, and stabbed him. Defendant got the man's knife, and the man threatened to shoot defendant. Defendant believed the man, who weighed 100 pounds more than him, was going to kill him. When the man tackled defendant on Jefferson Street, he used the man's knife to defend himself.

¶ 15        Also, on August 24, 2021, Dr. Youmans conducted an autopsy of Westbrook. At the time of his death, Westbrook was 37 years old, weighed 228 pounds, and was 5 feet, 8 inches tall. Defendant had suffered numerous injuries. He had cuts on his hands, upper chest, and thigh, and his cheek was bruised. Abrasions were located on his forehead, face, hands, side, and left knee. Westbrook also had stab wounds on his lower back, face, neck, and upper chest. The stab to Westbrook's neck caused injury to Westbrook's larynx, thyroid gland, and right jugular vein, which caused substantial bleeding. Dr. Youmans opined the stab wound to the neck was the fatal wound. She also testified the cuts and abrasions on Westbrook's hands were consistent with defensive-type wounds. Additionally, Dr. Youmans testified that, at the time of death, Westbrook's blood alcohol concentration was 0.204 and he had marijuana in his system.

¶ 16        Defendant testified he was 55 years old, weighed 166 pounds, and was 6 feet, 4 inches tall at the time of the incident. Defendant had walked to Taft Homes with his dog and

drank three beers. He denied bringing a knife with him. While defendant sat with his dog, Westbrook, whom defendant had never seen before, exchanged words about the dog, and defendant moved further away from Westbrook. Another man gave defendant a fifth of tequila, from which Westbrook took a drink without defendant's permission. Defendant then let Westbrook have the rest of the tequila and walked away from Westbrook. Defendant estimated Westbrook drank three-fourths of the fifth of tequila.

¶ 17    As defendant began walking towards the entrance of Taft Homes, he heard the tequila bottle "go down" and said, "[H]e cut his hand." Westbrook jumped up with both of his fists down and said the following: "You think I won't put both of my hands on you and your dog and make you break yourself and take everything you got." Defendant continued to walk up the sidewalk with his back to Westbrook. Defendant got pushed, and when he turned around, Westbrook hit him. Westbrook hit defendant a second time and tackled him to the ground. The pair then tussled on the ground. When defendant maneuvered Westbrook over, they both looked around, and defendant noticed he was bleeding from his head and arm. Westbrook had stabbed and cut defendant but lost the knife. Defendant got to his feet with Westbrook's knife and tried to make his way to the entrance. Westbrook did not know defendant had his knife and said the following to defendant: "I'll blow your mother f*** head off. You're gonna give me what I said. You gonna do this. You gonna kill me, you go ahead." They again swung at each other. As defendant made his way to the entrance of Taft Homes, Westbrook kept running up to him, and they would swing at each other, which continued all the way to Danz's office. Defendant explained they were face to face because Westbrook was jogging backwards. Westbrook was also making threatening statements and suggesting he had a gun. Defendant admitted that, when he and Westbrook were near the church, they could have both gone in different directions but

neither one wanted to do so.

¶ 18    At Danz's office, they were swinging at each other when Westbrook charged defendant taking them both to the ground. Westbrook swung at defendant and defendant swung at Westbrook with Westbrook's knife. When Westbrook finally retreated, defendant jumped to his feet. Westbrook then walked away, and defendant left. Defendant did not know the extent of Westbrook's injuries. He did not call the police when he arrived home.

¶ 19    At the conclusion of the trial, the jury found defendant guilty of first degree murder. Defendant filed a posttrial motion. On April 13, 2022, the trial court held a joint hearing on defendant's posttrial motion and sentencing. After hearing the parties' arguments, the court denied defendant's posttrial motion. As to sentencing, the State presented the presentence investigation report (PSI) and the testimony of Detectives Robert Allen and John Rodgers. Additionally, Amy Funches, Westbrook's mother, read her victim impact statement to the court. Defendant made a statement in allocution and presented the testimony of (1) Steven Johnson, his uncle, and (2) Diane Knox-Fleming, his cousin. The court also reviewed the surveillance videos from defendant's trial.

¶ 20    Detective Allen testified he investigated an August 11, 2021, assault and battery of Donovan Watson at Taft Homes. Watson was unconscious when the police arrived and was transported to the hospital. At the hospital, Watson told Detective Allen he had been in an altercation with defendant near a liquor store, and defendant chased him through Taft Homes. There, defendant assaulted Watson and left him unconscious. Watson identified defendant as the perpetrator in a photographic array. Detective Allen collected surveillance videos from Taft Homes, which showed Watson falling to the ground. While Watson was on the ground motionless, defendant stomped on Watson's head twice. When Detective Allen interviewed

- 7 -

defendant, he said Watson had inhaled nitrous containers and thrown bricks and a 2x4 at him. Defendant also told Detective Allen that Watson had exposed himself to defendant and made statements about having sexual intercourse with defendant. Defendant stated Watson's conduct upset him. Defendant felt Watson had not learned his lesson yet, so defendant was going to beat his "a***."

¶ 21       Detective Rodgers testified about an April 2021 incident. According to Detective Rodgers, a gas station employee told the police a man came into the gas station and was trying to return a knife. An argument ensued and the man said some racial slurs to the employee, who then told the man to leave. The man continued to argue and called the employee out from behind the counter. The employee came out from behind the counter, and the man pulled a gun. After threatening the employee, the man shoved the employee, pointed the gun at him, and left the store. The employee recognized the man by his face but did not know his name. The man was wearing a baseball cap and sunglasses at the time of the incident. The police obtained a surveillance video of the incident, and the police recognized defendant as the man who threatened the employee. The employee also identified defendant as the man in a photographic lineup. The State played surveillance videos of both incidents for the trial court.

¶ 22       Funches considered defendant a close family member and noted the violent manner in which her son died. She noted how much pain losing Westbrook caused her family and questioned why defendant had not shown any remorse.

¶ 23       Johnson testified he had frequent contact with defendant over the years and described him as a strong family man. Johnson's parents had 12 children, and those children had many children. They were a big close-knit family that took care of each other. Defendant was always there to help and protect his family members. Johnson was very shocked to hear what

happened because it was not the person Johnson knew. Johnson's family did not tolerate gun violence. However, he admitted defendant was the type of person who would not back down or run from something. Defendant would always defend himself.

¶ 24 Knox-Fleming had also been around defendant since his birth. Knox-Fleming described defendant as a sensitive and caring member of the family and sought leniency from the trial court. Additionally, she explained how proud and happy defendant had been to get a new job three days before the incident. Like Johnson, Knox-Fleming noted defendant was not one to walk away from a challenge and he was often challenged due to his big size.

¶ 25 Defendant made a statement in allocution. He acknowledged he knew Westbrook's mother and uncles but denied knowing Westbrook. Defendant again stated Westbrook was the aggressor and he did not set out to do anything to anybody. He insisted he was just trying to defend himself and tried to distance himself from Westbrook three times. Defendant was sorry for what happened and sorry he and Westbrook crossed paths. Defendant apologized to Westbrook's family.

¶ 26 The trial court sentenced defendant to 50 years' imprisonment. The court noted defendant received glowing testimonials and it believed defendant's witnesses. However, it believed something else was going on and found defendant had "a temper that just blows," which a person has to be able to rein in. The court noted defendant's claim Westbrook was following him was a lie. It further explained defendant had many opportunities to stop pursuing Westbrook and continued to pursue him for two to three blocks. We note the written sentencing judgment gave the statutory citation for knowing first degree murder, which was not the most serious form of murder charged.

¶ 27 On April 14, 2022, defendant filed a motion to reconsider his sentence, arguing

the trial court's sentence was excessive and amounted to a *de facto* life sentence.. He argued the court placed too much emphasis on the aggravating evidence of the other incident at Taft Homes and the aggravating factors of defendant's criminal history and the need to deter others from committing the same crime. Defendant also asserted the court should not have considered the evidence related to the April 2021 incident. Additionally, defendant alleged the court failed to consider or give sufficient weight to the following:

> "(i) Defendant's statement of allocution, which included repeated apologies to the victim's family, (ii) letters and testimony about his character, (iii) work history, (iv) family support, (v) the Defendant's age, which makes the sentence a near-certain life sentence, and (vi) all other arguments raised by Defendant and his counsel on his behalf during his sentencing hearing."

Defendant further alleged the court erred by finding his rehabilitative potential was poor. The court held the hearing on defendant's motion to reconsider his sentence on April 18, 2022. After hearing the parties' arguments, the court denied the motion to reconsider. The court explained that, even if it sentenced defendant to the minimum statutory sentence, it was still a life sentence given defendant's age. The court also stated the defense noted defendant apologized repeatedly. However, the court noted the apologies were insufficiently specific. Additionally, the court found defendant did not have good rehabilitative potential and noted defendant stomped on the victim of the other Taft Homes incident after the victim had been lying on the ground.

¶ 28 On April 22, 2022, defendant filed a timely notice of appeal in sufficient compliance with Illinois Supreme Court Rule 606 (eff. Mar. 12, 2021). Accordingly, this court has jurisdiction of defendant's appeal under Illinois Supreme Court Rule 603 (eff. Feb. 6, 2013).

¶ 29                                          II. ANALYSIS

¶ 30　　　　Defendant asks this court to reduce his sentence or, in the alternative, vacate his sentence and remand the cause for a new sentencing hearing because his 50-year sentence for first degree murder is excessive.  The State disagrees and also asserts this court should not consider the material outside the record that defendant cites on appeal.

¶ 31　　　　The Illinois Constitution mandates "[a]ll penalties shall be determined both according to the seriousness of the offense and with the objective of restoring the offender to useful citizenship."  Ill. Const. 1970, art. I, § 11.  In sentencing a defendant, the circuit court must consider a number of statutory aggravating and mitigating factors.  See 730 ILCS 5/5-5-3.1, 5-5- 3.2 (West 2020).  However, "the seriousness of an offense is considered the most important factor in determining a sentence."  *People v. Jackson*, 2014 IL App (1st) 123258, ¶ 53, 23 N.E.3d 430.

¶ 32　　　　With excessive sentence claims, this court has explained appellate review of a defendant's sentence as follows:

> "A trial court's sentencing determination must be based on the particular circumstances of each case, including factors such as the defendant's credibility, demeanor, general moral character, mentality, social environment, habits, and age. [Citations.]  Generally, the trial court is in a better position than a court of review to determine an appropriate sentence based upon the particular facts and circumstances of each individual case. [Citation.]  Thus, the trial court is the proper forum for the determination of a defendant's sentence, and the trial court's decisions in regard to sentencing are entitled to great deference and weight. [Citation.]  Absent an abuse of discretion by the trial court, a sentence may not be altered upon review. [Citation.]  If the sentence imposed is within the statutory

- 11 -

range, it will not be deemed excessive unless it is greatly at variance with the spirit and purpose of the law or is manifestly disproportionate to the nature of the offense." (Internal quotation marks omitted.) *People v. Price*, 2011 IL App (4th) 100311, ¶ 36, 958 N.E.2d 341; see also *People v. Alexander*, 239 Ill. 2d 205, 212, 940 N.E.2d 1062, 1066 (2010).

The sentencing range for first degree murder is 20 to 60 years' imprisonment (730 ILCS 5/5-4.5-20(a)(1) (West 2020)). Thus, defendant's 50-year prison sentence was within the proper statutory range.

¶ 33                          A. Scholarly Articles Outside the Record

¶ 34            In support of his argument his sentence is excessive, defendant cites several articles from various journals. Thus, we begin our analysis by addressing the State's argument we should disregard those articles in addressing defendant's excessive sentence claim. Defendant disagrees with the State, contending the refusal to consider such information stands in opposition to several Illinois Supreme Court and other court decisions.

¶ 35            In this case, the trial court found defendant's prospects for rehabilitation were poor given he had three violent episodes within a year. In his appellant brief, defendant argues the trial court failed to adequately consider the mitigating evidence reflective of defendant's rehabilitative potential. Defendant notes the PSI stated defendant was homeless but had a job and was in the process of getting a new job. He then cites a law review article that such actions are indicative of defendant's rehabilitative potential. Defendant further argues the PSI shows defendant had never been diagnosed with any mental health conditions and cites several articles in support of his contention the proper treatment of anger management issues increases the likelihood of rehabilitation and decreases the risk of reoffending.

¶ 36          The State notes the trial court never admitted the articles cited by defendant, the articles were not provided by defendant in the appellate record, and they appear to be written by advocacy groups. A review of defense counsel's comments at sentencing indicates counsel raised neither of the aforementioned arguments regarding rehabilitative potential in the trial court but instead focused on defendant's good character. As such, defendant is presenting evidence via the articles not considered by the trial court but which is aimed at impeaching the trial court's factual determination regarding defendant's rehabilitative potential. This court has found such materials are not appropriate for our consideration and declined to give them any weight. *In re R.M.*, 2022 IL App (4th) 210426, ¶ 46, 198 N.E.3d 677.

¶ 37          The facts before us are distinguishable from *People v. Huddleston*, 212 Ill. 2d 107, 816 N.E.2d 322 (2004), cited by defendant. There, the Illinois Supreme Court addressed whether the sentencing provision as applied to the defendant violated the proportionate penalties clause because it was "cruel, degrading, or so wholly disproportionate to the offense committed as to shock the moral sense of the community." (Internal quotation marks omitted.) *Huddleston*, 212 Ill. 2d at 132, 816 N.E.2d at 337. In analyzing the issue, the supreme court cited numerous articles. See *Huddleston*, 212 Ill. 2d at 134-35, 816 N.E.2d at 338. However, in analyzing the claim of a proportionate penalties clause violation, the supreme court gave no deference to the trial court's determination of that claim (*Huddleston*, 212 Ill. 2d at 129, 816 N.E.2d at 335), and the issue required the supreme court to examine the general consensus on matters related to sex crimes against children. Moreover, our review of the appellate court cases from other districts cited by defendant does not persuade us to depart from our decision in *R.M.*

¶ 38          Accordingly, we will disregard the articles cited by defendant and the arguments based on those arguments that were not raised in the trial court.

¶ 39                           B. Excessive Sentence

¶ 40         Defendant contends the trial court failed to (1) adequately account for (a) his

remorse and (b) the mitigating evidence indicative of his rehabilitative potential and

(2) appropriately balance rehabilitation and retribution with the objective of restoring defendant

to useful citizenship.  The State contends defendant forfeited portions of his argument for failing

to raise them in the trial court.

¶ 41         Defendant contends he expressed deep remorse for killing Westbrook and the trial

court discounted that remorse because defendant did not admit he was guilty of first degree

murder.  Defendant relies on the court's comments at the hearing on the motion to reconsider his

sentence.  We do not find his contention forfeited.  When the court was discussing defendant's

apologies at the hearing on defendant's motion to reconsider his sentence, the court stated it

understood why a defendant would not admit guilt in a statement of allocution and it was

defendant's choice to make a general apology.  The record contains no evidence the court

punished defendant for not admitting his guilt.  The court was merely explaining it did not give

defendant's apologies a great deal of weight because they were general.  We disagree with

defendant's contention the trial court failed to adequately consider defendant's remorse and

punished him for not admitting his guilt.

¶ 42         Defendant next contends significant mitigating evidence of his rehabilitative

potential was presented at the sentencing hearing.  As previously found herein, defendant's

arguments related to his homelessness and lack of anger management treatment that were

supported by scholarly articles outside the record were forfeited.  Defendant also argues the

evidence of his strong family ties is indicative of rehabilitative potential.  In this case, the trial

court had to balance the evidence of defendant's family ties and good character with that of

- 14 -

defendant's lengthy criminal history and his violent actions on more than one occasion. Defendant's argument essentially asks us to reweigh the evidence, which is not the role of this court. Defendant's first criminal conviction was in 1983, and the last conviction before the first degree murder charge was in 2016. He had a total of 10 misdemeanors and 3 felonies. The PSI does not reveal the underlying facts of those convictions, but we disagree with defendant that we can infer none of the convictions were a crime of violence. Regardless, defendant's criminal history spanning several decades and committing numerous crimes does not support a claim he had rehabilitative potential. Moreover, the State's evidence of the two recent violent incidents also cuts against rehabilitative potential. Accordingly, we disagree with defendant he had significant rehabilitative potential. Additionally, we agree with the trial court any sentence it gave defendant was essentially a life sentence given defendant's age of 56. Thus, that fact alone is not a basis for a lesser sentence. Given the violent nature of the crime and the fact video evidence suggests the crime could have been easily avoided, we find the trial court did not abuse its discretion in sentencing defendant to 50 years' imprisonment.

¶ 43                                    III. CONCLUSION

¶ 44            For the reasons stated, we affirm the Peoria County circuit court's judgment.

¶ 45            Affirmed.